NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

MONARK BOAT COMPANY,
Respondent.

No. 82–1963.

United States Court of Appeals,
Eighth Circuit.

Submitted April 13, 1983.

Decided July 22, 1983.

Elinor Hadley Stillman, Barbara A. Atkin, N.L.R.B., Washington, D.C., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Tim Boe, Jim Hunter Birch, Rose Law Firm, Little Rock, Ark., for respondent Monark Boat Co.

Before ARNOLD, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BENNETT,* Circuit Judge.

ARNOLD, Circuit Judge.

The National Labor Relations Board asks this Court to enforce its order that Monark

---

* The Hon. Marion T. Bennett, United States Cir-   cuit Judge for the Federal Circuit, sitting by

Boat Company of Monticello, Arkansas, bargain with the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (UBC)[1]. Monark urges us to revoke the union's certification and order a new election, or order a post-election hearing to resolve issues raised by Monark's objections. We agree with Monark that a hearing is necessary on the issue of alleged coercion. Enforcement of the Board's order is therefore denied at this time, and the cause is remanded with directions that the Board conduct an evidentiary hearing and allow direct and cross-examination of all testimony upon which it intends to rely.[2]

## I.

On November 6, 1980, the UBC won a Board-conducted election by a vote of 77 to 57. Thirty-three eligible voters abstained. Monark filed approximately 50 objections, alleging, in general, that (a) UBC officials and employee supporters created an atmosphere of coercion which tainted the election; (b) UBC officials and employee supporters made material misrepresentations about significant campaign issues; and (c) UBC officials engaged in improper electioneering in or near the voting areas, immediately before and during the election. The Board's Acting Regional Director (ARD) conducted an administrative investigation and afforded the parties an opportunity to submit evidence.[3] He overruled all of Monark's objections without a hearing and certified the UBC as the exclusive bargaining representative.

Monark appealed to the Board. The Board did not ask the ARD to send it the information that he obtained through the administrative investigation and denied Monark's request for review. The UBC requested that Monark bargain with it, but Monark refused. The UBC then filed an unfair-labor-practice charge, and the Board issued a complaint charging the company with violations of Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (5) (1976). In its response Monark alleged that it need not bargain with the UBC because it had been denied an evidentiary hearing on its objections to the election.[4] The General Counsel moved for summary judgment on the ground that Monark had already litigated these issues and lost. The Board granted summary judgment and ordered Monark to bargain with the UBC. The Board then asked us to enforce its order.

## II.

■ The trier of fact must conduct a hearing to determine the validity of a certification election when there are substantial and material issues of fact. *NLRB v. Griffith Oldsmobile, Inc.,* 455 F.2d 867, 868 (8th Cir.1972).[5] In order to make out a substantial and material issue of fact which warrants a hearing

> * * * [i]t is incumbent upon the party seeking a hearing to clearly demonstrate that factual issues exist which can only be resolved by an evidentiary hearing.

designation.

1. The Board order is reported at 260 N.L.R.B. No. 74, 109 L.R.R.M. (BNA) 1226 (1982).

2. There is no merit to Monark's argument that the union should be decertified.

3. This procedure is in accordance with Board Regulations, 29 C.F.R. § 102.69(c) & (d) (1981 & 1982). On September 15, 1981, after the Board certified the UBC as the exclusive bargaining representative, but before it found that Monark had unlawfully refused to bargain, 29 C.F.R. § 102.69 was amended. The Board assumed that the amended regulations are applicable to this case (App. 284), and we have no reason to disagree.

4. The company raised other affirmative defenses but has evidently abandoned them on appeal.

5. The amended Board regulations make it absolutely clear that this is the procedure it will follow. 29 C.F.R. § 102.69(d) (1982) says that: "Such hearing shall be conducted with respect to those objections or challenges which the regional director concludes raise substantial and material factual issues." The ARD cannot rely on the fruits of an administrative investigation to resolve such issues. *Erie Coke & Chemical Co.,* 261 N.L.R.B. No. 8, at 2–3, 109 L.R.R.M. (BNA) 1373, 1374 (1982).

The exceptions must state the specific findings that are controverted and must show what evidence will be presented to support a contrary finding or conclusion. * * *

Mere disagreement with the Regional Director's reasoning and conclusions does not raise 'substantial and material factual issues.' This is not to say that a party cannot except to the inferences and conclusions drawn by the Regional Director, but that such disagreement, in itself, cannot be the basis for demanding a hearing. To request a hearing a party must, in its exceptions, define its disagreements and make an offer of proof to support findings contrary to those of the Regional Director.

*Id.* at 868–69 (quoting *NLRB v. Tennessee Packers, Inc., Frosty Morn Division,* 379 F.2d 172, 178 (6th Cir.), *cert. denied,* 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967)). We now turn to Monark's objections to determine whether they raise material issues of fact.

#### A.

■ During a representation election the Board must provide "a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." *General Shoe Corp.,* 77 N.L. R.B. 124, 127 (1948). The Board must set aside an election if an atmosphere of coercion and fear rendered free choice impossible. Such a determination is difficult to make, and each case must turn on its facts. See *Zeiglers Refuse Collectors, Inc. v. NLRB,* 639 F.2d 1000, 1005 (3d Cir.1981).

■ Monark's objections and supporting affidavits at least suggest that the elections were held in a coercive environment. We note the following alleged incidents:[6]

1) During the first week of September, about two months before the November 6th election, an employee described as "a known union supporter" told some workers not to work overtime and that their cars would be damaged if they crossed a picket line (Obj. 15b, App. 132, 230).

2) Irma Holdcraft, an employee, told a group of employees around the middle of September that even if the union came in and called for a strike, she would work. Another employee, a "strong union supporter," responded, "I'm not saying this will happen here, but it has been known to happen where someone crossing a picket line got bricks and clubs up side their heads" (Obj. 15c, App. 231). Ms. Holdcraft then "stopped talking." *Ibid.*

3) Ms. Holdcraft also stated that on another occasion another employee, also a strong union supporter, said that "no one would cross her picket line because she would be prepared" (Obj. 15d, App. 132, 231).

4) Irma Gean Harrison also said she would come to work in the event of a strike. Another employee said that "people can get killed or hurt crossing picket lines" (Obj. 15e, App. 132, 232). Ms. Harrison took this to mean that she could get killed crossing a picket line (App. 232).

5) On November 6, the morning of the election, an employee said, "After the union comes in, people that don't join the union won't be here very long" (Obj. 15f, App. 133, 232).

6) As the employees were lining up to vote, Robert White indicated he would not vote. An employee wearing a union T-shirt said, "Just do what I told you, Robert." White joined the line waiting to vote (Obj. 15g, App. 133, 191).

7) Harry Densmore, an employee who supported the union, had on three separate occasions damaged company property (Obj. 23a, App. 74–75). Monark presented its production manager, E.G. Dendy, who swore that pro-union sentiments motivated these actions and that Densmore intended

---

6. We recite these allegations only in order to describe Monark's factual claims. Whether the incidents actually occurred, and whether, if they did, an atmosphere of coercion and fear resulted that materially affected the outcome of the election, are questions of fact to be decided by the Board in the first instance.

to scare others into supporting the union (App. 234–35).

8) On October 23, three pro-union employees refused to complete a project (Obj. 23b, App. 138, 239–40) and left Ms. Holdcraft, an anti-union employee, to complete it. This evidently was not how they had divided the work in the past, and Ms. Holdcraft "felt that the reason that the three employees walked off the project was because of her expressed anti-union sentiments as opposed to their pro-union sentiments" (App. 240).

9) On July 30, 1980, a union supporter approached Supervisor Gale Mac Harrison at his home and asked him to help the union organize. Harrison is Ms. Holdcraft's son-in-law and Irma Gean Harrison's husband. Harrison refused, stating that as a supervisor he could not properly become involved. The same union supporter, Mark Huff, also went to Ms. Holdcraft's house and discussed the possibility of Harrison's helping the union. On September 12, 1980, Harrison's dog became ill. The dog died that night of rat poisoning—according to a veterinarian, either a massive dose recently administered or minor doses over the preceding two weeks. On October 6 another union adherent came to the Harrison home and asked him to support the union and become an "informant" (App. 199) for it. Harrison had owned the dog for 2½ years. It was kept chained at all times. No neighbors had complained about it. There had been no other dog poisonings in the neighborhood. In fact, a neighbor of the Harrisons had ten dogs, none of them poisoned (see generally Obj. 11, App. 193–201).

These claimed incidents, considered in isolation, would probably be insufficient to raise an inference of coercion and intimidation sufficient to make an evidentiary hearing necessary. But taken together, we think, they do reach that level.

We find the poisoning of the dog especially disturbing. Harrison stated that he had "no facts that anyone from the union organizing effort poisoned my dog. I just believe they did it" (App. 194). In context, it is clear that Harrison's statement that he had "no facts" meant only that he had no eyewitness or other direct evidence. There was, however, a good deal of circumstantial evidence, if the Harrison affidavits are to be believed, as they must be at this procedural stage of the case. The state of the record on this question would be sufficient to preclude the granting of a motion for summary judgment, if this were a civil action in a federal district court.

The poisoning occurred within a month of what were either acts of sabotage or unusual work disruptions. The company suffered at least several hundred dollars in damages on account of mishaps involving Densmore and could have lost over $1,000 because of the failure of other pro-union employees to complete a project in a routine manner. Acts of sabotage and vandalism may undermine free elections. See *NLRB v. Belcor, Inc.,* 652 F.2d 856, 861 (9th Cir. 1981). The employees involved were actively pro-union and had not previously been guilty of misconduct on the job. Monark bears the burden of showing that these were in fact acts of sabotage designed to intimidate the voters, but for that a hearing is necessary.

We are also concerned with Robert White's apparent decision to vote only after a union sympathizer said "Just do what I told you, Robert." This statement may have been innocuous. It does, however, at least suggest that White was pressured into voting.

The first five incidents we have listed relate to threats or comments which were made during the election campaign but which were not directly related to the election. Pro-union employees suggested that strike breakers could suffer bodily harm and damage to their property and that opponents to the union could lose their jobs once the union came in. Because these kinds of threats are remote from the election proceeding itself, they would be insufficient, considered alone, to invalidate the election, but here they must be considered in the broader context of all of the incidents alleged by the company. The threats made during the election campaign against Ms.

Holdcraft, Ms. Harrison, other potential strikebreakers, and anti-union employees, in the context of all the facts of this case, at least suggest that the laboratory conditions necessary for elections may not have been provided. See *Loose Leaf Hardware, Inc. v. NLRB,* 666 F.2d 1036 (6th Cir.1981) (mem.); *Hickory Springs Mfg. Co. v. NLRB,* 645 F.2d 506, 510 (5th Cir. Unit A 1981); *Wilkinson Manufacturing Co. v. NLRB,* 456 F.2d 298, 303–04 (8th Cir.1972). But see *NLRB v. Golden Age Beverage Co.,* 415 F.2d 26, 31–32 (5th Cir.1969).

It is true that some employees told the ARD that they did not feel intimidated by the union. A hearing, however, is necessary to determine whether the work force as a whole, or a significant portion of it, was intimidated.[7] It is also necessary to decide whether those threatened were engaging in bravura when denying their fear or whether the threats were innocuous and did not spawn any fear. The fact that 33 out of approximately 185 eligible voters did not vote—more than enough to affect the outcome—at least suggests the possibility that many workers were afraid to vote. See *Eliason v. NLRB,* 688 F.2d 22, 23 (6th Cir.1982) (order).

We have recently stated that "even where an incident of misconduct, not insubstantial in nature, is insufficient by itself to show that an election was not an expression of free choice, two or more such incidents, when considered together in the totality of the circumstances, may be deemed sufficient to support such a conclusion." *Bauer Welding and Metal Fabricators,* 676 F.2d 314, 318 (8th Cir.1982) (footnote omitted). See also *NLRB v. Southern Paper Box Co.,* 473 F.2d 208, 211 (8th Cir.1973).

The history of *Beaird-Poulan Division, Emerson Electric Co. v. NLRB,* 571 F.2d 432 (8th Cir.1978), *order enforced after hearing on remand,* 649 F.2d 589 (8th Cir.1981), is instructive and illustrates the necessity for and benefit of the legal requirement that a hearing be held when material issues of fact have been raised. When the case first came before us, the Regional Director had made an investigation but had not conducted a hearing, just as occurred in this case. The RD had overruled objections filed to the election results by the company, despite company allegations that the union had conducted a campaign of fear and intimidation that permeated the entire atmosphere in such a way as to destroy the laboratory conditions required by the Board in its election proceedings. We held that summary judgment had been improperly granted, and that the company's allegations, if true, would warrant the setting aside of the election. Enforcement of the Board's order was therefore denied, at least for the time being, and the case was remanded to the Board for a hearing. This Court's opinion listed certain alleged incidents of violence and intimidation that should be inquired into on the remand, including a claim that "an employee's windows [were] broken after he refused to act as a union in-plant organizer." 571 F.2d at 434 n. 2.

On remand, an administrative law judge held a hearing, afforded the parties full rights of cross-examination, and made credibility determinations. Of the more than twenty specific allegations of misconduct claimed by the company, all but five were discredited, and each of the five remaining incidents was attributed to union supporters, as opposed to union representatives or agents. In addition, none of the five credited incidents actually resulted in any physical harm or violence to employees or their property. The ALJ concluded that the credited incidents, even when taken together, were not sufficiently serious to warrant setting aside the election. On petition for review, this Court affirmed. We noted that each of the coercive allegations listed in our previous opinion had been disbelieved by the ALJ, and we declined to disturb, as an

---

7. We recognize that in some settings the objected-to comments may be mere banter and not serious threats. See *Abbott Laboratories, Ross Laboratories Div. v. NLRB,* 540 F.2d 662, 667 (4th Cir.), *cert. denied,* 429 U.S. 831, 97 S.Ct. 93, 50 L.Ed.2d 95 (1976); *NLRB v. Bostik Div., USM Corp.,* 517 F.2d 971, 973 (6th Cir. 1975). In the circumstances of this case, that question is for the trier of fact to determine after a hearing.

abuse of discretion, the ALJ's conclusion that the credited incidents were not sufficiently serious to justify disregarding the results of the election. In short, the Board's order was ultimately enforced, but only after procedures fair to the objecting party had been properly conducted.

In reaching our decision we are mindful of the fact that the parties seem to agree that union supporters and not union agents committed the alleged coercive acts. Employees may not be so intimidated by threats or comments made by a fellow employee as they would be by an ominous statement made by a union agent. Moreover, a union cannot always maintain control over all employees who support it. The focus of our inquiry is not solely on who made the threats. The question is whether threats, by whomever made, created a coercive environment. A threat made by a company or a union agent is a weightier piece of evidence, but threats by adherents of either side may still be probative in a given case. "[R]epresentation elections will be set aside where nonparty misconduct has taken place and such conduct is shown to have created 'an atmosphere of fear and reprisal such as to render a free expression of choice impossible.'" *NLRB v. Griffith Oldsmobile, Inc., supra,* 455 F.2d at 870 (quoting *Manning, Maxwell & Moore, Inc. v. NLRB,* 324 F.2d 857, 858 (5th Cir.1963)).

### B.

■ Monark makes approximately twenty-five objections based on allegedly false promises and misrepresentations made by the union during the election campaign. They are without merit.

The NLRB has vacillated on the issue of when misleading campaign statements should invalidate an election. In *Hollywood Ceramics Co.,* 140 N.L.R.B. 221 (1962), the Board held that

> an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective

> reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election.

*Id.* at 224 (footnote omitted). In *Shopping Kart Food Market, Inc.,* 228 N.L.R.B. 1311 (1977), the Board overruled *Hollywood Ceramics.* The Board stated that employees are sophisticated enough to recognize campaign propaganda for what it is and held that the Board would intervene only "where a party has engaged in such deceptive campaign practices as improperly involving the Board and its processes, or the use of forged documents which render the voters unable to recognize the propaganda for what it is." *Id.* at 1313 (footnote omitted). The Board quickly overruled *Shopping Kart* and reinstated the *Hollywood Ceramics* analysis in *General Knit of California, Inc.,* 239 N.L.R.B. 619 (1978). The Board has now reversed itself again and reinstated the *Shopping Kart* rule. *Midland National Life Insurance Co.,* 263 N.L.R.B. No. 24, 110 L.R.R.M. (BNA) 1489 (1982).

The Board enjoys wide discretion when it comes to establishing the procedures necessary to insure fair and free elections, *e.g., NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330, 67 S.Ct. 324, 327–28, 91 L.Ed. 322 (1946), and it has acted within its power in this instance. Whereas the *Hollywood Ceramics* rule promotes overextensive analysis of campaign propaganda and encourages parties to argue that various campaign statements were misrepresentations, the *Shopping Kart* rule clearly distinguishes between objectionable and nonobjectionable conduct. It discourages vexatious and pugnacious litigation and promotes the quick resolution of certification elections. It assumes that employees are capable of assessing and disregarding false campaign promises. *Midland National Life Insurance Co., supra,* 263 N.L.R.B. No. 24, at 17–18, 110 L.R.R.M. at 1492–93. There is "a reasonable basis in law" for the Board's return to the *Shopping Kart* analysis, and we therefore defer to its decision. See *NLRB v. Hendricks County Rural Electric Member-*

*ship Corp.,* 454 U.S. 170, 176, 102 S.Ct. 216, 221, 70 L.Ed.2d 323 (1981). Under the *Shopping Kart* rule Monark's objections to [8] alleged deceptions and misrepresentation fail to raise a material issue of fact and do not necessitate a hearing.[9]

Monark would have us apply *Shopping Kart* prospectively only and analyze its objections in light of *Hollywood Ceramics.* This we decline to do.

Appellate courts usually apply the law in effect at the time of the appellate decision. *Bradley v. School Board of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). This is true as long as no manifest injustice results, *id.* at 717, 94 S.Ct. at 2019, and is especially true when the law states that it is to be applied retroactively. *Id.* at 712–17, 94 S.Ct. at 2016–19. The Board expressly stated that it was reapplying the *Hollywood Ceramics* rule " 'to all pending cases in whatever stage.' " *Midland National Life Insurance Co., supra,* 263 N.L.R.B. No. 24, at 21 n. 24, 110 L.R.R.M. at 1494 n. 24 (quoting *Deluxe Metal Furniture Co.,* 121 N.L.R.B. 995, 1007 (1958)). No manifest injustice arises. The parties were harmed, if at all, only to the extent that their belief that *Hollywood Ceramics* would still be applied caused them to be more scrupulously honest during the election campaign. Several courts of appeals have already applied *Shopping Kart* retroactively. See *NLRB v. Milwaukee Brush Mfg. Co.,* 705 F.2d 257 (7th Cir.1983) (per curiam); *NLRB v. Rolligon Corp.,* 702 F.2d 589 (5th Cir.1983). *But cf. Mosey Manufacturing Co. v. NLRB,* 701 F.2d 610, 612 (7th Cir.1983) (en banc) ("The present case is so unusual, however, that we cannot be sure it was in the Board's contemplation when the Board announced in a footnote that the new rule would apply to all pending cases.")

### C.

■ By objections 8, 9, and 10, the company contends that the union engaged in prohibited last-minute electioneering. Approximately ten minutes before the election Wanda Phillips, a union representative, spoke to several employees. Monark produced no evidence of what she said. Edward Fortson, another union representative, spoke to employees during the election but 50 feet away from the building where the election was being held. The polling place was 40 feet inside the buildings. Again Monark produced no evidence of what was said. These objections do not warrant a hearing.

The Board has held that *"[d]uring the voting period . . . .* sustained conversation with prospective voters *waiting to cast their ballots,* regardless of the content of the remarks exchanged, constitutes conduct which, in itself, necessitates a second election." *Milchem, Inc.,* 170 N.L.R.B. 362, 362 (1968) (emphasis ours). Neither the Phillips nor the Fortson incidents fall under the *Milchem* rule. Phillips spoke to employees *prior* to the election. Monark offered no proof that she engaged in electioneering. Fortson spoke to two laid-off employees during the election, but they were standing well outside the voting area and were not yet waiting in line to vote. *Milchem* therefore does not apply, and in order to invalidate the election Monark must prove that the two union representatives actually electioneered. It has not done so.

The Board held in *Peerless Plywood Co.,* 107 N.L.R.B. 427, 429 (1953), that "employers and unions alike will be prohibited from making election speeches on company time to massed assemblies of employees within 24 hours before the scheduled time for conducting an election." *Peerless Plywood* does not, however, like *Milchem, assume* that a casual conversation is objectionable. Monark bore the burden of showing that Fortson and Phillips actually electioneered.

---

**8.** By holding as we do, we are not necessarily stating our own preference for the *Shopping Kart* rule, but only acknowledging that the Board acted within its discretion when it readopted it.

**9.** Several of Monark's objections may be read to contend that the union made misrepresentations involving the Board and its processes. A close reading of the record shows, however, that these objections are also wholly without merit and fail to raise a material issue of fact.

Monark's witnesses testified that they did not hear the content of the conversations. Monark therefore did not raise a material question requiring a hearing on this issue.[10]

Monark also objects to the election proceedings because the union solicited supervisory support. This argument is wholly without merit. First of all, it is actual supervisory support, not mere solicitation of supervisory support, that *may* invalidate an election. Moreover,

> [s]upervisory support for a union will invalidate the union's majority only when the supervisor's activities (1) cause the employees to believe that the supervisors are acting on behalf of the employer and that the employer favors the union, or (2) lead the employees to support the union because they fear future retaliation by the supervisors.

*NLRB v. Wehrenberg Theatres, Inc.,* 690 F.2d 159, 162 (8th Cir.1982) (per curiam) (citations omitted). In the case at hand the company vigorously opposed the union, and the supervisors clearly supported the company (App. 193–95, 202–03, 210–12); there is no suggestion that any employee thought otherwise. A hearing on this issue is unnecessary.

### III.

In sum, we reject the company's claims of misrepresentation and electioneering, but we agree that its allegations of coercion deserve an evidentiary hearing. On remand the Board must hold an evidentiary hearing to resolve issues of fact raised by objections 15b, c, d, e, f, g, 23a and b, and the last assertion in objection 11. Moreover, if the trier of fact wants to rely on material gathered through an administrative investigation, this information must be available to both parties. In a very similar setting we have held that "the company must be afforded the opportunity to produce evidence that might rebut testimony of union witnesses or at least subject those witnesses to the 'cleansing rigors of cross-examination.' *NLRB v. Commercial Letter, Inc.,* 455 F.2d 109, 113–114 (8th Cir. 1972)." *Beaird-Poulan Division, Emerson Electric Co. v. NLRB, supra,* 571 F.2d at 434. This is particularly true in this case, where the hearing officer will have to delve into employees' states of mind to determine whether the alleged coercive incidents had a chilling effect on the election. In order to do so the trier of fact must be afforded the opportunity to observe the witnesses' demeanor during direct and cross-examination. *E.g., Methodist Home v. NLRB,* 596 F.2d 1173, 1181 (4th Cir.1979).[11]

Enforcement of the Board's order is denied. The case is remanded for an eviden-

---

**10.** Even if the union representatives had electioneered, we have doubts whether *Peerless Plywood* would have been applicable. Fortson and Phillips do not seem to have made a "speech" in front of a "massed assembly."

**11.** Both sides have briefed the issue of whether the Board erred in reviewing the ARD's initial rejection of the company's objections without having before it any ex parte material upon which the ARD relied. The recent trend has been to require that the entire record be before the Board, whether or not there exists a material issue of fact. *NLRB v. Allis-Chalmers Corp.,* 680 F.2d 1166, 1168–69 (7th Cir.1982); *NLRB v. Klingler Elec. Corp.,* 656 F.2d 76, 81–84 (5th Cir. Unit A 1981); *NLRB v. North Elec. Co., Plant No. 10,* 644 F.2d 580, 584 (6th Cir.1981). But see *Revco D.S., Inc. v. NLRB,* 653 F.2d 264, 267–68 (6th Cir.1981). The Ninth Circuit appears to believe that the RD should transfer to the Board everything upon which he relied, but that if no material issue of fact was raised by the objecting party, failure to transfer is harmless error. *NLRB v. Eskimo Radiator Mfg. Co.,* 688 F.2d 1315, 1318 (9th Cir.1982) (per curiam). Cf. *NLRB v. Northeastern University,* 707 F.2d 15 (1st Cir.1983) (the agency's decision to withhold investigatory material is reasonable where the RD does not rely on it). Counsel for the Board vigorously argues that the ARD did not rely on ex parte material. If we had to rule on this contention, we should find it difficult to accept, because the ARD's opinion recites at several points testimony received ex parte from witnesses opposing the objections filed by the company. It is difficult to understand why material not relied on would appear in an opinion. Nevertheless, we need not decide the point in the present case, because we have held that evidence proffered by the company, considered alone, was sufficient to raise a material issue of fact. On remand, of course, no issue as to ex parte material will arise, because the evidentiary hearing will reveal to both sides all of the evidence to be considered by the Board.

tiary hearing in accordance with this opinion.

It is so ordered.