## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## NEW COLUMBUS NURSING HOME, INC., Respondent.

### No. 83–1176.

United States Court of Appeals, First Circuit.

Argued Sept. 13, 1983.

Decided Nov. 9, 1983.

---

Frederick Havard, Atty., Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on brief, for petitioner.

Victor D. Del Vecchio, Boston, Mass., with whom Edward R. Lev, Larry L. Varn, and Sullivan & Worcester, Boston, Mass., were on brief, for respondent.

Before CAMPBELL, Chief Judge, ALDRICH and COWEN *, Senior Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

This is an application by the NLRB for enforcement of an order requiring New Columbus Nursing Home ("New Columbus") to bargain with the Teamsters. The Teamsters ("the union") conducted a representation election campaign in three proposed bargaining units of New Columbus's employees. New Columbus mounted a campaign attacking the union's poor fiscal condition and alleges that it "sensitized" the workers to the issue. New Columbus sent letters to its employees indicating that the union's balance sheet showed total liabilities equal to three times its total assets. Four days before the election, the union sent a letter to the employees in which the union claimed that it "finished in the black after only one year of [the new secretary treasurer's] Administration." The union won the election, but New Columbus objected to certification on the ground that the union's letter was misleading regarding its solvency. In certifying the union over the company's objection, the Board, under the standard of *Hollywood Ceramics Co.,* 140 NLRB 221 (1962), looked into the truth or falsity and seriousness of the alleged union misrepresentations. The Board concluded that de-

---

* Of the Federal Circuit, sitting by designation.

spite the union's negative net worth as indicated by its balance sheet, the union's letter was accurate if viewed as relating only to its income statement, which showed a positive cash flow for the prior year.

Following certification of the union, the Board overruled the *Hollywood Ceramics* standard in *Midland National Life Insurance Co.,* 263 NLRB No. 24, 110 L.R.R.M. (BNA) 1489 (1982), and indicated that it was returning to a position described in *Shopping Kart Food Market, Inc.,* 228 NLRB 1311 (1977). Under *Shopping Kart,* the Board will not review the substance of the alleged misrepresentations, but rather will set aside an election only if a party has used forged documents or altered Board documents during its campaign.

New Columbus refused to bargain with the union, and the union filed an unfair labor practice complaint with the Board. New Columbus defended on the ground of the union's election misrepresentation. The Board applied the *Midland (i.e., Shopping Kart)* rule and refused to examine the substance of the alleged misrepresentation. Since the union had not used forged documents in the campaign, the Board again approved the election and ordered New Columbus to commence bargaining.

■ The courts will enforce a Board order unless such order has "no reasonable basis in law." *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979); *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944). This inquiry can be resolved into two main elements: 1) whether the Board acted within an area of regulation committed to it by Congress, *NLRB v. Insurance Agents,* 361 U.S. 477, 499, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960); and 2) whether the Board properly applied the correct legal standard, *Chemical Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 166, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971).

The first element is· clearly satisfied in the instant case. It is well settled that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946). Thus in adopting and applying the *Midland* rule, the Board was functioning within its established area of regulation.

■ With respect to the correctness of the legal standard, the relevant law in this case is section 7 of the National Labor Relations Act which provides that "[e]mployees shall have the right to self-organization . . . ." 29 U.S.C. § 157. This section has been interpreted as guaranteeing the "unhampered freedom of choice" of employees in selecting a bargaining representative. *International Association of Machinists Lodge No. 35 v. NLRB,* 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940). While the Board insists that it continues to recognize its duty to protect employee free choice, we must decide whether this statutory obligation has been adequately satisfied.

Although the Board announced in *Midland* a broad rule "that we will no longer probe into the truth or falsity of the parties' campaign statements, and that we will not set elections aside on the basis of misleading campaign statements," 263 NLRB No. 24 at 21, 110 L.R.R.M. (BNA) at 1494 (footnote omitted), that rule is implemented through the Board's case-by-case adjudication of labor disputes. In passing on the validity of the rule, therefore, we do so only with respect to the situation arising in the instant case.

The Board in *Midland* balanced "the possibility that some voters may be misled by erroneous campaign propaganda," against the "impediments to free speech," the impairment of the finality of election results, and the lack of uniformity in national labor laws spawned by *Hollywood Ceramics.* *Midland,* 263 NLRB No. 24 at 17–20, 110 L.R.R.M. (BNA) at 1492–93. The Board concluded that the balance favored not re-

viewing the substance of campaign misrepresentations.[1]

As applied to campaign statements of the type presented in the instant case, we cannot say the Board violated section 7 by following the *Midland* rule. The Board's duty to protect employees' right to self-organization encompasses a variety of factors including the safeguarding of free campaign speech,[2] the finality of election results and the swift effectuation of employees' choices.[3] The alleged misrepresentation concerning the union's solvency was the kind of statement not easily categorized as being either true or false. In any case, it was scarcely likely to have affected the employees' free and fair choice. As to such a statement the Board could reasonably refuse to take the time and trouble to adjudicate its truth or falsity, believing that refusal to do so would better accommodate the other interests included within its duty to protect employees' right to self-organization. In so holding, however, we do not necessarily endorse application of the *Midland* rule to situations involving charges of more fundamental and clear-cut misrepresentations. The Board has a duty to provide reasonably for the employees' "unhampered freedom of choice." *International Association of Machinists Lodge No. 35,* 311 U.S. at 80, 61 S.Ct. at 88. Some misrepresentations may be so material and fraudulent as to undermine the employees' freedom of choice, rendering their section 7 right to self-organization a nullity. Were this such a case, the Board's flat insistence, under *Midland,* upon certifying the results of the fraudulent election might constitute legal error. Here, however, we cannot say

that the Board's approach was inconsistent with the employees' right to exercise a "fair and free choice" in the selection of a bargaining representative. *See, e.g., A.J. Tower Co.,* 329 U.S. at 330, 67 S.Ct. at 328. We therefore uphold the Board.

■ New Columbus also objects to the retroactive application of *Midland* to the election campaign. The Board clearly intended *Midland* to apply retroactively " 'to all pending cases in whatever stage.' " 263 NLRB No. 24 at 21 n. 24, 110 L.R.R.M. (BNA) at 1494 n. 24 (*quoting Deluxe Metal Furniture Co.,* 121 NLRB 995, 1006–07 (1958) ). According a newly adopted rule retroactive effect is proper unless "manifest injustice" results. *Bradley v. School Board of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *New England Power Co. v. United States,* 693 F.2d 239, 244 (1st Cir.1982). We see nothing like that here. *See NLRB v. Monark Boat Co.,* 713 F.2d 355, 361 (8th Cir.1983).

*The Board's order is enforced.*

BAILEY ALDRICH, Senior Circuit Judge (concurring).

I have no problem with the result in this case, but wish to say more about the *Midland* rule. It is hard to think it was not fathered by frustration. I am unpersuaded by the Board's expressed exasperation and surrendering to the difficulty of determining what is a "substantial" misstatement.[1] If the matter is important, surely this cannot be an excuse for not deciding it. Its large backlog, and the relative low cost of the very substantial benefits to be obtained by contesting elections, not unnaturally

---

1. Two circuits have since upheld the application of the *Midland* rule. *NLRB v. Yellow Transportation Co.,* 709 F.2d 1342 (9th Cir. 1983); *NLRB v. Monark Boat Co.,* 713 F.2d 355 (8th Cir.1983).

2. "[F]airness in elective process demands here, as it does in public or corporate elections, the opportunity of contesting parties to communicate their respective positions to the electorate." *NLRB v. Hanes Hosiery Division—Hanes Corp.,* 384 F.2d 188, 191 (4th Cir.1967), *cert. denied,* 390 U.S. 950, 88 S.Ct. 1041, 19 L.Ed.2d 1141 (1968).

3. The Board may adopt a rule prohibiting post-election challenges to voter eligibility because such challenges "destroy the finality of the election result [and] invite unwarranted and dilatory claims by defeated candidates ...." *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 331, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946).

1. *Midland Nat'l Life. Ins. Co.,* 263 N.L.R.B. No. 24, 110 L.R.R.M. 1489, 1492–93.

causes the Board to seek remedies. With respect, however, *Midland* seems to be burning down the barn to get rid of the rats; an abnegation of the Board's recognized duty to ensure a fair and free choice of bargaining.

None of the reasons given, either in *Midland,* or herein, seem to me to support such an extreme rule. Finality of elections is attractive, but it can exact a price if all falsehoods are to be routinely overlooked.[2] Protection of speech has never extended to intentionally false, material misstatements. *Cf. New York Times Co. v. Sullivan,* 1964, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (speech about public officials is protected unless deliberately false or made with reckless disregard for the truth); *Ohralik v. Ohio State Bar Ass'n,* 1978, 436 U.S. 447, 461–62, 98 S.Ct. 1925, 1921–22, 56 L.Ed.2d 444 (in-person solicitation by lawyers may be regulated because of state's interest in preventing "fraud, undue influence, intimidation" or "misrepresentation"). I have no objection to a strict standard with regard to intent, and a very high standard as to materiality, but the *Midland* rule is a departure in kind, not in degree.

I am particularly troubled by the analogy to political elections. A political candidate subject to misrepresentations must take his lumps; he has no place to turn. The Board, however, was created precisely to supervise and achieve fairness.

As to the Board's assertion that what is said during an election campaign is of no moment anyway, I can only ask why are there union campaigns, and why should falsehoods be manufactured and spread if the result was preordained? I can agree with the Board that hyperbole and exaggeration may be the hallmark of electioneering, and that sophisticated employees may be expected to make allowances. But by calling all falsehoods "propaganda" the Board does not meet the difference between seller's talk, even of the sort that might be condemned by the Federal Trade Commission, and flat statements of positive fact.

Sophistication does not mean that one knows everything to be false. Indeed a forgery, n. 2, ante, might well appear more suspicious than many apparently plausible statements of positive fact. Nor does the Board in any way explain how employees' "skepticism" will adequately discount statements of facts, but may be unable to deal with "promises." *Midland,* ante, at 1494.

Finally, I must wonder whether *Midland,* although it happened to involve employer misrepresentation, will not be in practice basically a pro-union rule. Since there is to be no penalty, obviously the rule creates a strong temptation to tell last minute falsehoods. If the union tells such, and loses the election anyway, it suffers no harm. If it wins, and the falsehood is discovered, some employees may be disgruntled, but there is nothing they can do about it. On the other hand, if the employer tells last minute falsehoods, win or lose, their subsequent revelation may have a serious effect on its labor relations. Without assigning any greater morality on one side than the other, I suspect that unions will be the ones more likely to take advantage of the virtually unbridled license now afforded by *Midland.* Any such inequality would be regrettable.

Turning to the case at bar, although the Board did not attempt to apply what I would regard a proper rule, I am satisfied that such a rule—and I agree with the court that this is not the time to determine its exact bounds—would lead to the present result. While the timing seems to indicate the union's improper intent, and prevented the employer's response, the materiality of the misrepresentation could be found not high. I accordingly concur.

---

**2.** The Board does except forgeries, because "no voter could recognize the propaganda 'for what

it is.'" *Midland National Life Ins. Co.,* ante, at 1493.