**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MICHIGAN RUBBER PRODUCTS, INC., Respondent.**

**No. 83–5313.**

United States Court of Appeals, Sixth Circuit.

Argued May 10, 1984.

Decided June 20, 1984.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., Elinor Hadley Stillman, Paul E. Bateman, Ellen Boardman, argued, Detroit, Mich., for petitioner.

Peter J. Kok, Craig H. Lubben, argued, Grand Rapids, Mich., for respondent.

* Honorable Avern Cohn, United States District Court for the Eastern District of Michigan, sitting by designation.

Before KENNEDY and JONES, Circuit Judges, and COHN, District Judge.*

PER CURIAM.

This is an application for enforcement of a National Labor Relations Board bargaining order. The United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO–CLC (union) held an election among employees of respondent Michigan Rubber Products, Inc. (company) on July 19, 1979. The union won the election by a vote of 38 to 31, and the company filed objections to the manner in which the election was conducted. The Regional Director issued a Report and Recommendation on Objections on August 15, 1979, recommending that the company's objections be overruled and the union certified. The company then filed exceptions to the report, arguing that the Regional Director should have conducted a hearing. The Board certified the union on October 16, 1979, adopting the Regional Director's findings and recommendations. On October 19, 1979, the union requested the company to bargain with it, which the company refused to do. The union filed an unfair labor practice charge with the Board. The Board's General Counsel filed a complaint with the Board and later moved for summary judgment, which the Board granted on August 12, 1980. The Board ordered the company to bargain with the union.[1]

The Board filed this application for enforcement of its August 12, 1980 order on May 3, 1983. The parties have not bargained during the intervening three years. Upon an examination of the record, and after careful consideration of respondent's arguments against enforcing the Board's order, we order enforcement.

**I.**

Respondent first argues that the Board's enforcement action is barred by laches because the Board delayed almost three years

1. Reported at 251 N.L.R.B. 74, 105 L.R.R.M. 1056 (1980).

after its bargaining order was filed before bringing this enforcement proceeding. The Board explains that the delay "result[ed] from a breakdown in communications between the office that referred the case for enforcement and the office responsible for seeking enforcement."

The Board cites two cases in which the Supreme Court ordered enforcement of a bargaining order in the face of lengthy delays. While neither case is precisely on point they are nonetheless persuasive.

First the Board cites *NLRB v. Pool Manufacturing Co.*, 339 U.S. 577, 70 S.Ct. 830, 94 L.Ed. 1077 (1950), in which the court allowed the Board to bring an enforcement proceeding two and a half years after entering a bargaining order. In *Pool*, the Board and the employer had been negotiating for at least part of those two and a half years, and the court found that "exhaustion of negotiation techniques before a decree is requested may consume many months after the Board's order and before such techniques fail." *Id.* at 580, 70 S.Ct. at 832. A strict judicial time limitation would therefore frustrate Congress' purpose of permitting, but not requiring resort to an enforcement decree, said the court. *Id.* Here, the record does not show any communication between the Board and the company during the three-year interim. However, as the *Pool* court noted, respondent cannot complain of the delay because "[t]he employer ... could have obtained review of the Board order when it was entered ... [and] is hardly in a position to object [to any delay]." *Id.* at 581, 70 S.Ct. at 832.

The Board also cites *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), in which the court stated: "Inordinate delay in any case is regrettable, but Congress has introduced no time limitation into the [National Labor Relations] Act except that in § 10(b) [which requires that complaints of unfair labor practices be filed within six months of the occurrence of such practices]." *Id.* at 748 n. 16, 82 S.Ct. at 1114 n. 16. The challenged delay in *Katz* was a period of almost three years between the occurrence of the unfair labor practices and the Board's final decision and order. *See NLRB v. Katz*, 289 F.2d 700, 701 (2d Cir.1961). We note that *Katz* dealt with a statute of limitations question and did not specifically address the issue of laches presented here.

We do not doubt that at some point laches would apply against the Board for inordinate delay in bringing an action. The Supreme Court has, however, indicated that delays of over two years are not intolerable. To hold otherwise would tend to penalize the union for the Board's delinquency—though at some point it could become incumbent upon the union to urge the Board into action.

■ Here, however, there is no allegation that the delay has in any way prejudiced respondent, or given the Board, or union, an unfair advantage. Absent such a change in the relative positions of the parties the doctrine of laches will not apply. *Armco, Inc., v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1161 (5th Cir.1982); *NLRB v. Norfolk Shipbuilding and Drydock Corp.*, 172 F.2d 813 (4th Cir.1949). The court in *Norfolk* enforced the Board's order in spite of a delay of over two years in seeking enforcement, noting that no substantial harm had resulted from the delay, and that if there had been a loss of the union majority this stemmed from the company's failure to comply with the Board's bargaining order. *Id.* at 816.

Respondent argues that the question of harm is not dispositive, that the Board has an affirmative obligation to show that its order does justice to respondent's current employees. The company argues that it would now be an injustice to "force" representation on the employees. Respondent cites *NLRB v. Eanet*, 179 F.2d 15 (D.C.Cir. 1949), and *NLRB v. Marion Rohr*, 114 L.R.R.M. 2126 (2d Cir.1983). However, both of these cases involve bargaining orders which were issued without any election ever having been held, and so are not persuasive here, where respondent's employees voted for the union.

Respondent's contention is in addition refuted by *NLRB v. DIT–MCO Inc.*, 428 F.2d 775 (8th Cir.1970), in which there was a delay of nearly two years between the election and certification by the Board. The court enforced the Board's order, saying:

> Mere administrative delay affords no defense to an unfair labor practice charge. This policy of the law preserves the position of the contending parties as of the time of the election, not their posture at the close of litigation. If, in some instances, the rights of the majority are subjected to minority control, relief lies in seeking a change in representation through a new election following the statutory period of one year.

*Id.* at 781 (citations omitted).

Accordingly, we find that the Board's action is not barred by laches.

## II.

Respondent contends that the union election was invalid and the Board improperly issued a bargaining order because 1) the Board's agent at the election exhibited favoritism towards the union; 2) the union committed illegal electioneering at the polls; and 3) the union made misrepresentations at a time when respondent could not effectively respond. The question for review is whether the Board abused its discretion in issuing the bargaining order. *See NLRB v. Holland American Wafer Co.*, 683 F.2d 135, 137–38 (6th Cir.1982); *NLRB v. Hardy-Herpolsheimer Division of Allied Stores Inc.*, 453 F.2d 877, 878 (6th Cir.1972); *NLRB v. Dean Foods Co.*, 421 F.2d 664 (6th Cir.), *cert. denied*, 398 U.S. 939, 90 S.Ct. 1843, 26 L.Ed.2d 271 (1970); *cf. Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351 (6th Cir.1983) (applying substantial evidence standard).

## A.

The first claim that the Board agent improperly showed a pro-union bias is based on three incidents which occurred at the company on election day. The election was held in two shifts to accommodate the company's employees, who worked morning and afternoon shifts. The election was held in the company's lunchroom, and the voting booth and ballot box were removed between voting periods. In addition to the Board agent there were present, during the polling periods, two union observers and two company observers.

Respondent's first complaint is that the Board agent stationed a union observer at the door to the voting area and instructed him to admit the employees into the voting area one at a time. Respondent contends that this gave the impression of prejudice towards the union and appeared to give the union control of the voting process.[2]

██ However, the Board agent apparently issued her instruction to the observers as a group, and not to the union observer in particular, who happened to perform the task because he was standing closest to the door at the time. There is evidence that it was necessary to have someone control the flow of traffic in order to avoid congestion, because there was only one door in and out of the lunchroom. At the same time, a company observer stationed himself by the ballot box, which negated any suggestion of partiality towards the union. The Board was justified in concluding that the placement of these observers had no impact on the votes cast in the election.

The company's second complaint is that following the morning polling session a union representative carried the metal voting booth to the agent's car, while the agent carried the ballot box and election kit. As the Board agent and the union representative left the voting area they were accompanied initially by two company managers, the company and union observers, and another union representative. The two union representatives and one observer accompanied the agent to her car.

2. Respondent cites *Summa Corp. v. NLRB*, 625 F.2d 293 (9th Cir.1980), in which the court refused to enforce a bargaining order because the union had been allowed one more observer than the company.

■ Respondent argues that this situation gave the appearance of fraternization, and compares it to a case in which the Board set aside an election because the Board agent was seen between voting periods having a beer with a union representative,[3] and a case where the agent was seen at a restaurant where a union organizational meeting was taking place and the agent was introduced at the meeting. *Provincial House, Inc. v. NLRB,* 568 F.2d 8 (6th Cir. 1977). We find that, while it may have been imprudent of the Board agent to allow the union representative to assist her, this action could not have had any effect on the outcome of the election. A Board agent having a beer with a union representative presents an entirely different situation than that of a female Board agent allowing a male union representative to help her by carrying a polling booth. The first situation would certainly imply to the observer that there was some social or business bond between the participants, while the latter situation could be based entirely on practical, physical logistics. As for our decision in *Provincial House,* we said:

> We would like to be specific about the precise conduct which we feel carried the activity of the NLRB representative past the point of arguably defensible conduct, so as to represent a per se violation of the Board's neutrality rule. That point in our view came when the NLRB representative allowed himself to be introduced to the union organizational meeting.

568 F.2d at 11. The Board agent's allowing the union representative to carry the polling booth hardly rises to the same level as the situation in *Provincial House.*

■ The third incident which respondent complains of occurred shortly before the afternoon polling session. An anti-union cartoon had been placed in a locked, glass-enclosed company bulletin board some 75 feet from the polling area, and a second one on a wall some 200 feet from the polling area. The company was within its rights in so displaying the cartoons, but the Board agent nonetheless instructed a company observer and a union observer to remove them. The observers did this with the help of the company personnel director, who unlocked the glass case.

The company argues that this action compromised the Board's neutrality. It cites *Glacier Packing Co.,* 210 N.L.R.B. 571, 86 L.R.R.M. 1178 (1974), in which the Board set aside an election when the Board agent had removed anti-union badges which the employer's observers were wearing at the polling place, and had ordered the employer to cease distributing anti-union literature 200 feet from the polling place. Respondent argues that its case is stronger than *Glacier,* because in *Glacier* the Board agent himself removed the anti-union buttons. Here the company and union observers removed the cartoons, and the union observer was known to be strongly pro-union. The company argues that the union observer's participation in removing the cartoon gave the impression that the Board had a pro-union bias.

Again, we disagree. The case here is much weaker for the Board agent's compromise of neutrality. The union and company observer together removed the cartoons, with help from the company personnel director. This bipartisan action should have negated any inference of impartiality on the part of the Board. There would have been more of an appearance of bias if the Board agent had removed the cartoons herself, as in *Glacier.* The Board found that its agent was overzealous; however, the Board did not abuse its discretion in determining that it was highly unlikely that the action could have had any effect on the outcome of the election.

### B.

■ Respondent next argues that the election should be set aside because the union conducted illegal electioneering at

**3.** *Athbro Precision Engineering Corp.,* 166 N.L.R.B. 966 (1967), *vacated sub nom. IUE v. NLRB,* 67 L.R.R.M. 2361 (D.D.C.1983), *acq.,* 171 NLRB 21 (1968), *enforced, NLRB v. Athbro Precision Engineering Corp.,* 423 F.2d 573 (1st Cir.1970).

the polls. The company cites two incidents. First, during the morning voting session a union observer said something in response to a comment made by an employee who had already voted. There is no evidence as to the content of the exchange. The Board agent told the observer not to talk to the employees, and the incident was not repeated.

A second incident occurred during the morning session, when two employees who had already voted left the voting room and stopped to talk to two other employees. The Board agent ordered those employees who had already voted to leave, and they did so. There is no evidence as to whether the two employees outside the voting area were waiting to vote, no evidence that the two leaving the voting area were union supporters, and no evidence regarding the content of the conversation.

Respondent argues that under *Milchem, Inc.*, 170 N.L.R.B. 362 (1968), there is a per se rule against conversations between representatives of either election party and voters waiting to vote, without regard to the content of the conversations. But *Milchem* also says that this "does not mean that any chance, isolated, innocuous comment or inquiry by an employer or union official to a voter will necessarily void the election." The incidents here do not rise even to the level of such chance comments. In the first incident the employee had already voted, and in the second there is no evidence that the employees who had already voted were union representatives. Respondent cites *NLRB v. Carroll Contracting and Ready-Mix, Inc.*, 636 F.2d 111, 113 (5th Cir.1981), for the proposition that electioneering carried on by persons who do not represent either party may nonetheless void an election. In *Carroll*, however, the challenged incident involved former company employees wearing pro-union shirts and signs who were urging employees waiting outside the polling area who had not yet voted to vote for the union. No such egregious conduct is al-leged here, and respondents point to no conduct which invalidates the election.

## C.

■ Respondent argues that the election should be set aside on the basis of campaign misrepresentations made by the union. The first question here is the correct test for determining when an election should be set aside on the basis of campaign misrepresentations. Respondent urges a test first enunciated in *Hollywood Ceramics Co.*, 140 N.L.R.B. 221, 51 L.R.R.M. 1600 (1962), under which an election should be set aside if there is: 1) a misrepresentation of material fact involving a substantial departure from the truth; 2) made by a party with special knowledge of the truth; 3) communicated so shortly before the election that the other party has insufficient time to correct it; 4) involving facts about which the employees are not in a position to know the truth. 140 N.L.R.B. at 224.

The Board initially reviewed the company's objections to the election at issue here under the *Hollywood Ceramics* test. Under the Board's current practices, however, as announced in *Shopping Kart Food Market, Inc.*, 228 N.L.R.B. 1311, 94 L.R.R.M. 1705 (1977),[4] and *Midland National Life Insurance Co.*, 263 N.L.R.B. 127, 110 L.R.R.M. 1489 (1982), the Board no longer looks into the truth or falsity of the parties' campaign statements. The Board now will set aside an election because of misleading campaign statements only in the case of forged or altered documents, which are not alleged here. The Board in *Midland* stated that it would apply this standard "to all pending cases in whatever stage." 263 N.L.R.B. 127 at n. 24. We believe that the proper test for us to apply here is that currently applied by the Board. *NLRB v. Semco Printing Center, Inc.*, 721 F.2d 886, 888 (2d Cir.1983); *NLRB v. Monark Boat Co.*, 713 F.2d 355, 361 (8th Cir.1983); *see St. Elizabeth Hospital v. NLRB*, 715 F.2d 1193, 1198 (7th Cir.1983) (case remanded to

---

**4.** *Shopping Kart* was overruled by *General Knit of California, Inc.*, 239 N.L.R.B. 619 (1978), but reinstated by *Midland. See Mosey Mfg. Co. v. NLRB*, 701 F.2d 610 (7th Cir.1983) (en banc).

the Board for a determination of the standard to be applied). However, we find that under either test the Board was justified in finding that there is no basis for setting aside the election on grounds of campaign misrepresentations. The facts presented here are as follows.

A few days before the election the union sent to the company's employees two pieces of campaign literature, a sheet entitled "Bombs Away", and a six-page pamphlet called "Lookout Below". The materials outline scare tactics and false promises which the union says management uses to keep unions out. The literature is illustrated with drawings of bombs, and management personnel scheming against the union and employees. The materials refer to "the company" and "the boss" generally, and never to respondent Michigan Rubber or its managers by name. Apparently these materials are produced for dissemination whenever an election is to be held for any employer, and are not aimed at any specific employer.

Respondent's management first received this material three days before the union election. On the next day respondent sent out the last of its campaign literature, which warned employees of the risks of having a union. Respondent also held an employees' meeting prior to the election, during which management refuted some of the statements made in the union literature. The company now argues that all that it was able to do was to make a general denial of wrongdoing, but that such a denial could not be an effective response to the union literature, under *Hollywood Ceramics*. Respondent cites no authority on this point.

The union literature did not make any material misrepresentations about respondent Michigan Rubber Products. Moreover, the fact that the company had time to send out campaign literature and to hold an employees' meeting before the election wholly undercuts respondent's claim that the union's communications were made so shortly before the election that the company had no time to correct them. Accordingly, even under *Hollywood Ceramics*, the Board was justified in deciding not to set aside the election.

### III.

The Regional Director (RD) may conduct a hearing upon objections to an election if such objections raise substantial and material factual issues, under 29 C.F.R. § 102.69(d), and the Board may order the RD to conduct a hearing on a party's exceptions to the RD's order if the exceptions raise such questions, under 29 C.F.R. § 102.69(f). *See NLRB v. Tennessee Packers, Inc.*, 379 F.2d 172 (6th Cir.), *cert. denied*, 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967). A party raises substantial and material questions of fact if its factual allegations and offers of proof establish a *prima facie* case for setting aside the election. *ATR Wire & Cable Co. v. NLRB*, 671 F.2d 188, 190 (6th Cir.1982); *Prestolite Wire Division v. NLRB*, 592 F.2d 302 (6th Cir.1979). The court said in *Prestolite*, quoting *Tennessee Packers*, 379 F.2d at 178:

> It is incumbent upon the party seeking a hearing to clearly demonstrate that factual issues exist which can be resolved by an evidentiary hearing. * * * Mere disagreement with the Regional Director's reasoning and conclusions do [sic] not "raise substantial and material issues." * * * To request a hearing a party must, in its exceptions, define its disagreements and make an offer of proof to support findings contrary to those of the Regional Director.

592 F.2d at 306.

The RD here did not hold a hearing on respondent's objections, and the Board adopted the RD's Report. The Board did not order a hearing on respondent's exceptions to the RD's Report. Respondent argues that it was entitled to a hearing and that the Board's order should consequently not be enforced. We find that the company's objections and exceptions did not present a *prima facie* case for setting aside the election, and that the RD and the Board therefore properly denied respon-

dent a hearing. There is little disagreement as to the facts of the incidents at issue, only as to the legal conclusions to be drawn from them. The company does appear to allege that the two employees who spoke with other employees after the first two had finished voting were union supporters. However, there is no evidence to support this among the company's affidavits which it presented to the RD. There is a controversy as to how many employees who were eligible to vote actually saw the election observers remove the anti-union cartoons, and how many saw the union representative carrying the polling booth to the Board agent's car, but the dispute is immaterial in light of the RD's proper conclusion that these activities did not compromise the Board's neutrality. Respondent has not offered proof of any fact which, if true, would require that the election be set aside.

Respondent also complains that the RD did not forward to the Board the complete record of his investigation, such as investigatory files, in support of his report. Respondent claims that the Board therefore abused its discretion in adopting the RD's Report and that this is grounds for denying enforcement. *See ATR Wire, supra.* We fail to see how respondent could have been prejudiced by an incomplete record, however, when its allegations challenging the RD's Report were insufficient grounds for setting aside the election even if true. *See Kitchen Fresh v. NLRB*, 716 F.2d 351 (6th Cir.1983).

We find all of respondent's arguments against enforcing the Board's order to be without merit. Accordingly we grant enforcement of the Board's order.