NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

BEST PRODUCTS CO., INC., Respondent.

No. 84–7645.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 9, 1985.

Decided July 10, 1985.

---

Helen Morgan, N.L.R.B., Washington, D.C., for petitioner.

Sidney L. Wolchok, New York City, for respondent.

Before HALL and WIGGINS, Circuit Judges, and SMITH, District Judge *.

WIGGINS, Circuit Judge:

The National Labor Relations Board (Board or NLRB) seeks enforcement of its order that Best Products Company, Inc. (Best) cease violating Sections 8(a)(1) and (5) of the National Labor Relations Act (Act), 29 U.S.C. 158(a)(1) and (5),[1] and bargain with United Food and Commercial Workers Local 428, AFL–CIO (Local 428) as the representative of the bargaining unit employees at Best's Campbell, California catalog showroom and warehouse. Best resists the order on the grounds that the election that gave rise to the bargaining order was flawed by an unequal number of employer and union observers and by pre-election union misrepresentations. It also contends that the unit has changed in content since the election. We grant the petition to enforce the order.

## I. FACTS

The Union petitioned the NLRB on March 24, 1982 for a representation election among Best's sixty-nine sales and warehouse workers. Employer, union and Board representatives executed a form "Stipulation for Certification Upon Consent Election" in April, 1982. It stated that "each party ... will be allowed to station

---

\* Honorable Russell E. Smith, United States District Judge for the District of Montana, sitting by designation.

1. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the (em-ployee organizational) rights guaranteed (by section 7 of the Act)." Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees".

an equal number of authorized observers ... at the polling places during the election to assist in its conduct, to challenge the eligibility of voters and to verify the tally.".

An election was held on June 3, 1982. The polling was in a small room in two sessions, the first between one and three p.m. and the other between five and seven p.m.

The Board Agent designated to supervise the election arrived at about noon that day to hold a pre-election conference with union and employer representatives. Some fifteen to thirty minutes before voting was to begin, the union asked to use two observers at each session in order to identify employees from both the showroom and warehouse. Best's representatives objected that they had but one observer ready. They stated that they could not remove another employee from work and quickly train that employee as an observer. The Best conferees also objected that the room used for balloting was too small to accommodate two observers for each side.

The Board Agent suggested that the employer use two observers, noted the objection, and proceeded with the vote. The employer had one observer at both sessions, while the union had two. The union received a majority of the votes cast.

Best filed objections to the conduct of the election concerning not only the unequal number of observers, but also alleged misstatements by the union during the campaign. The NLRB Regional Director investigated the objections and issued a "Report and Recommendations on Objections" of June 26, 1982 in which he ordered a hearing on the objections.

On August 4, 1982, the Board handed down its decision in *Midland National Life Insurance Company*, 263 NLRB 127, 110 LRRM 1489 (1982). The Board held that it would no longer set aside an election solely because of misleading campaign statements or misrepresentations of fact, but would only intervene where a party had used forged documents to disable voters from recognizing propaganda or had indicated Board endorsement of a party.

The Regional Director issued a "Supplemental Report and Recommendations on Objections", noting that after *Midland National*, Best's objections alleging nothing more than misrepresentations must be overruled. A hearing would be held only on the objection concerning the imbalance in observers.

A hearing was held on March 2, 1983 and a "Report on Objections" issued on September 7, 1983. The hearing officer found that the Board Agent requested, but the employer declined to use, an additional observer during the election. He recommended that Best's objection be overruled and Local 428 certified as the bargaining representative.

The employer filed exceptions to the hearing officer's report. On March 28, 1984, the Board, per Chairman Dotson and Members Hunter and Dennis, issued a Decision and Certification of Representative, which had the effect of overruling the objections and establishing the Union as bargaining representative. When Best refused to bargain with Local 428, the latter filed an unfair labor practice (u.l.p.) charge with the NLRB. The General Counsel issued a Notice to Show Cause and a complaint against the employer and moved for summary judgment.

In its response, Best incorporated and reaffirmed it post-election objections. On August 14, 1984, the same Board panel concluded that Best had violated the Act, ordered it to bargain and construed the initial period of Local 428's certification as beginning on the date that Best begins to bargain in good faith.

## II. STANDARD OF REVIEW

■ An order of the NLRB is to be enforced if the Board correctly applied the law and if the Board's findings of fact are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–488, 71 S.Ct. 456, 463–465, 95 L.Ed. 456 (1951); *Whisper Soft Mills, Inc. v. N.L.R.B.*, 754

F.2d 1381, 1384 (9th Cir.1984). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

■ The inquiry into whether the Board order has a "reasonable basis in law" for its order, see *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979), consists of two elements; firstly, whether the Board acted within an area of regulation committed to it by Congress, *NLRB v. Insurance Agents' International Union,* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960) and secondly, whether the Board properly applied the correct legal standard, *Allied Chemical and Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 166, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971).

### III. OBSERVERS

Best recounts that it received a letter from the Regional Director on May 25, 1982 stating that "Each of the parties may select an observer to represent him at the polling place" and adding "Please ask your observer to be available one-half hour before the opening of the polls." The employer avers that it relied on this letter in concluding that each side would be permitted to station a single observer at the polling place. The Board counters that the missive in question was merely a cover-letter for the transmission of the Notice of Election [2] and instructions to observers and did not represent an agreement between the parties as to the number of observers.

There was no pre-existing agreement concerning the absolute number of observers on each side, but only an agreement that each side would have an equal number of observers. Best focused upon the Regional Director's cover letter—which spoke in the singular concerning the number of observers—and not on the Stipulation or the Notice of Election that spoke of observers in the plural.

The Stipulation and not the cover letter embodies the agreement that the parties made concerning observers. Moreover, the regulatory guides to the Board's procedures are quite clear that parties may have more than a single observer each. *See* NLRB, "Rules and Regulations", 29 C.F.R. § 102.69(a) (1984); NLRB, *Outline of Law and Procedure in Representation Cases* at 277 (1974); NLRB, *Casehandling Manual,* Part II, ¶ 11,310 (1984).[3] It is evident from these guides and the leading treatises that it is both allowable and commonplace that more than one observer per party be used, even in a "small election." Observers have uncomplicated tasks and are therefore fungible and rapidly trained. The Board expects that some or all of the observers will be taught their tasks by a Board agent within minutes of the opening of the election and that the agent will be a guiding presence during the tenure of the observers. The principal task of the observer is one of identifying voters and the presence of more than one observer per side is an obvious aid in that regard. *See Casehandling Manual* at section 11318; C. Morris, *The Developing Labor Law* at 393–395 (1983); 2 T. Kheel *Labor Law* § 7A.05[5] at 7A–80 (1984); J. Feerick, H. Baer, J. Arfa, *NLRB Representation Elections* § 7.6.4 at 240 (1980).

---

**2.** The Notice of Election contained the following statement: **AUTHORIZED OBSERVERS** Each of the interested parties may designate an equal number of observers. This must be determined by the Regional Director or Agent in charge of the election. These observers (a) act as checkers at the voting place and at the counting of ballots, (b) assist in the identification of voters, (c) challenge voters and ballots, and (d) otherwise assist the Regional Director or agent.

**3.** The *Casehandling Manual* is replete with diagrams, including one of a "Typical 'floor plan' for small election". *Id.* at section 11316.1. This shows one checking table, one ballot box, one booth and *four* observers, two of whom are at the checking table and two at the ballot box. The Board suggests that one or two booths may be necessary in elections involving less than 25 voters, id. at 11316, implying that a "small election" is one with two dozen or less voters.

■ The "control of the election proceeding, and the determination of the steps necessary to conduct that election fairly (are) matters which Congress entrusted to the Board alone." *N.L.R.B. v. Waterman S.S. Corp.*, 309 U.S. 206, 226, 60 S.Ct. 493, 503, 84 L.Ed. 1036 (1940). The NLRB has wide discretion to determine representation matters and questions arising during election proceedings. *N.L.R.B. v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946); *N.L.R.B. v. Berryfast, Inc.*, 741 F.2d 1161, 1163 (9th Cir.1984). Reasoned interpretations of an act by the agency charged with administering it are entitled to deference, *Worthington v. Icicle Seafoods, Inc.*, 749 F.2d 1409, 1412 (9th Cir.1984) and we give considerable deference to the NLRB's expertise in construing and applying the labor laws. *Mingtree Restaurant, Inc. v. N.L.R.B.*, 736 F.2d 1295, 1297 (9th Cir.1984).

■ Where the Board's determination is within its area of expertise, it will not be overturned unless the Board has abused its discretion. *Scintilla Power Corp. v. N.L.R.B.*, 707 F.2d 419, 421 (9th Cir.1983). The Board agent here followed established procedure in allowing more than one observer per side shortly before the election was to commence and in suggesting to the employer that it maintain a parity with the union in the number of observers.[4]

The imbalance in observers here was the result of a choice freely made by the employer and is no cause for holding a new election. *See J.P. Stevens & Co., Inc.*, 244 NLRB 407, 454 (1979) In that respect, the case at bar is readily distinguishable from *Summa Corp. v. N.L.R.B.*, 625 F.2d 293 (9th Cir.1980), which Best contends is "controlling."[5]

Had there been an agreement here to limit the number of observers to one per side or had the Board Agent refused Best the opportunity to supply a second observer, see *Barceloneta Shoe Corp.*, 171 NLRB 1333, 1335 (1968) (employer refused to allow employee it unlawfully discharged to serve as union observer); *Breman Steel Co.*, 115 NLRB 247, 249 (1956) (Board agent erroneously refused to let employer use bargaining unit employee as observer), a convincing argument for the application of *Summa* might be made. However, in contrast to *Summa* and cases from other circuits that are relied upon by the employer, see, e.g., *N.L.R.B. v. Granite State Minerals, Inc.*, 674 F.2d 101, 102 (1st Cir. 1982), there is no divergence here from a stipulation on election procedure. Since the election process was not "significantly impaired" by any action of the union or the NLRB, the Board properly concluded that the election should not be set aside because of the disparity in the number of observers. *See NLRB v. Heath Tec Division/San Francisco*, 566 F.2d 1367, 1372 (9th Cir.), *cert. denied*, 439 U.S. 832, 99 S.Ct. 110, 58 L.Ed.2d 127 (1978).[6]

---

**4.** In *Westinghouse Appliance Sales and Service Co., a division of Westinghouse Electric Corporation*, 182 NLRB 481 n. 1 the Board stated that "the mere fact that the Employer had only one observer available to it at the election while the petitioners had two is not sufficient grounds for setting aside the election ... this imbalance in the number of observers did not create the impression that the Board favored the Petitioners over the Employer, or otherwise prejudice the election ... [T]he Board agent specifically advised the employer of its right to an equal number of observers which is entirely consistent with the provision in the Stipulation for Certification that each party would be allowed an equal number of observers ... [If it] constituted a variation from what the employer alleges was a prior oral understanding that one observer would represent each party ... the variation was immaterial and in no way compromised the fairness of the election."

**5.** In *Summa,* the Board Agent, without consulting the two observers for the employer, assented to a third union observer during the first of two voting sessions, although the Stipulation there provided for an equal number of observers for each side. This court agreed with the employer that there was a significant risk that "the imbalance, with the acquiesence of the Board agent, could create an impression of predominance on the part of the Union and partiality on the part of the Board." 625 F.2d at 295. Although no showing of actual prejudice had been made, the petition for enforcement was denied. *Id.* at 296.

**6.** The numerous cases cited by Best involving Board agent favoritism and other misconduct are inapposite. There is nothing in the record

## IV.  MISREPRESENTATIONS

### A.  Preservation of the Issue

Best claims that during the election campaign, Local 428 made material misrepresentations to employees which demand that the election be set aside.  The employer asserts that the Union falsely compared the then-existing wages at Best with those at a unionized competitor, mendaciously asserted that Best had threatened to close the store if the union prevailed and reopen with non-union employees, and untruthfully claimed that it had filed an u.l.p. charge in response to the threat.

■■■■ The NLRB retorts that the employer is precluded by Section 10(e) of the Act [7] from raising these objections.  Under Section 10(e), Courts of Appeal lack jurisdiction to review objections that were not urged before the Board.  *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982).  That provision is intended to insure that the Board has the opportunity to use its expertise and that the court will have the benefit of the Board's opinion.  *Marshall Field & Co. v. N.L.R.B.*, 318 U.S. 253, 256, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943); *Idaho Falls Consol. Hospitals, Inc. v. N.L. R.B.*, 731 F.2d 1384, 1386 (9th Cir.1984).

■■■■ In this Circuit, an employer who challenges a representation election irregularity must present its objection both in the certification proceeding and the u.l.p. proceeding to preserve the issue for appellate review.  *N.L.R.B. v. Belcor, Inc.*, 652 F.2d 856, 858 n. 2 (9th Cir.1981).  This is merely an application of the doctrine of exhaustion of administrative remedies.  *See Pinetree Transp. Co. v. N.L.R.B.*, 686 F.2d 740, 743 n. 2 (9th Cir.1982) (collecting cases).

Best failed to file exceptions to the Regional Director's Report and Recommenda-

tions but did raise the present issues in a statement in support of its post-election objections and in its exceptions to the Regional Director's Supplemental Report and Recommendations.  The issues were raised there with the sufficient specificity to constitute adequate notice to the Board during the certification proceeding.  *See NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 350, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953); *Hospital & Service Employees Union v. N.L. R.B.*, 743 F.2d 1417, 1426 (9th Cir.1984).  However, the NLRB objects that Best did not adequately renew its contentions in the u.l.p. proceedings, as it is required to do—absent exceptional circumstances not asserted here—in order to seek appellate review of those issues.  *See N.L.R.B. v. Children's Baptist Home*, 576 F.2d 256, 261 (9th Cir.1978).

Best's sole reference to the objections during the u.l.p. proceedings was a statement in its response to the Notice to Show Cause that it "incorporates by reference and reaffirms by reference its post election objections and brief."  Preliminarily, we must determine whether that statement " 'fairly put the Board on notice that the asserted valididty of the election was to be posed as a defense to the 8(a)(5) charge.' "  *Id.* at 262, *quoting NLRB v. Southbridge Street Metalworks, Inc.*, 380 F.2d 851, 854 (1st Cir.1967).

■■■■ Our test for determining the sufficiency of notice was first set out in *NLRB v. Giustina Bros. Lumber Co.*, 253 F.2d 371, 374 (9th Cir.1958) (issue may not be raised on appeal where it was raised in an objection that was "so ambiguous as to be totally ineffective to adequately apprise the Board" of the excepting party's intentions).  *See N.L.R.B. v. Southwest Sec. Equipment Corp.*, 736 F.2d 1332, 1336 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1854, 85 L.Ed.2d 151 (1985).  Generalized objec-

to indicate favoritism or even the appearance of favoritism.  If any employee found the imbalance in observers disconcerting, Best could have offered an explanation that the disparity was of its own making, i.e., that it chose to have but one observer present.

7.  Section 10(e), 29 U.S.C. § 160(e) provides, in pertinent part, that "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."

tions, e.g. to all of an ALJ's findings and conclusions, are, of course, usually inadequate to give notice. *See Marshall Field & Co. v. N.L.R.B.*, 318 U.S. at 255, 63 S.Ct. at 586. However, the Board has a "relitigation rule", first enunciated in *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 162, 61 S.Ct. 908, 917, 85 L.Ed. 1251 (1941), which states that in the absence of newly discovered and previously unavailable evidence or special circumstances, one is not entitled to relitigate in a u.l.p. proceeding any issue that was or could have been litigated in a prior representation proceeding and a Board decision on the u.l.p. will often (and does here) mainly consist of an enunciation of that rule, the issues having already been litigated in the representation proceeding. A detailed restatement, in response to an u.l.p. charge, of objections that have already been raised in a representation proceeding would, therefore, generally be futile.

■ We recognize that a party may abandon an issue that has been determined against it in a representation proceeding. Yet, if a party seeks to preserve an issue for review in an enforcement proceeding, it generally should be required to do little more in the u.l.p. proceeding than indicate that it has not renounced the issue. We decline to compel an objecting party against whom an u.l.p. is charged to engage in a full-blown, yet necessarily unavailing, re-argument of an issue that has already been decided against that party in a representation hearing merely to enable that party to later bring its objections to an election before this court. A firm indication to the Board of the objecting party's non-abandonment of the issue is generally adequate to preserve it for our review.

■ Additionally, the Board panel that passed on the employer's exceptions to the hearing officer's report on the elections was the same as that which decided the u.l.p. issue in this case. The Board's decision on the u.l.p. charges shows that it had actual notice of Best's attempt to press its misrepresentation claims in the u.l.p. proceeding. We conclude that Best's notice by incorporation effectively apprised the Board that the employer held to its misrepresentation claims. *Cf. N.L.R.B. v. Semco Printing Center, Inc.*, 721 F.2d 886, 893 (9th Cir.1983) (reference in footnote of brief submitted in enforcement action to arguments presented in original representation proceedings sufficient to preserve issues on appeal). That notice was also sufficient to preserve the misrepresentations issue for appellate review.

## B. The *Midland* Rule

Although there may be jurisdiction to consider the misrepresentations issue, it is wholly disposed of by *Midland National Life Insurance Co., supra.* That case was the fourth change in twenty years of the Board's position on how it deals with misrepresentation during election campaigns. In *Hollywood Ceramics*, 140 NLRB 221, 224 (1962), it was held that an election would be set aside where there had been

a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election (footnote omitted).

Fifteen years later, the Board overruled *Hollywood Ceramics* by its decision in *Shopping Kart Food Market*, 228 NLRB 1311 (1977). It held that it would no longer set aside an election solely because of misleading campaign statements or misrepresentations of fact, except that the Board would intervene where "a party has engaged in such deceptive campaign practices as improperly involving the Board and its processes," or where forged documents prevented voters from recognizing propaganda. *Id.* at 1313. However, in *General Knit of California*, 239 NLRB 619 (1978), the Board temporarily returned to the doctrine of *Hollywood Ceramics*, stating that its rule "assures the public that the Board will not tolerate substantial and material misrepresentations made in the final hours of an election campaign, and thereby gives

stability to any bargaining relationship resulting from the election." *Id.* at 623.

Finally, in August, 1982, the Board overruled *General Knit,* put an end, again, to the *Hollywood Ceramics* doctrine, readopted the reasoning in *Shopping Kart* and stated, in *Midland National Life Insurance,* 263 NLRB at 133 that

> [W]e will no longer probe into the truth or falsity of the parties' campaign statements ... no(r) set elections aside on the basis of misleading campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is.

Footnote 25 adds that

> when an official Board document has been altered in such a way as to indicate an endorsement by the Board of a party to the election.

The Board followed its usual practice and applied this "new policy" to " 'all pending cases in whatever stage.' " *Id.* at 133 n. 24, *quoting Deluxe Metal Furniture Company,* 121 NLRB 995, 1006–07 (1958).

Not long after *Midland* was handed down, the Board decided *Affiliated Midwest Hospital, Inc. d/b/a Riveredge Hospital,* 264 NLRB 1094 (1982). This overruled *Formco, Inc.,* 233 NLRB 61 (1977), which had held that a union interferes with an election when it distributes a letter which falsely reports that the employer had been guilty of u.l.p.'s, reasoning that since only the Board could find the employer guilty of a u.l.p., the union's statement improperly drew the board into the election. *Riveredge Hospital* held that a party's pre-election mischaracterization of NLRB action would be treated just like any other misrepresentation, i.e., it would not be an exception to *Midland.*

Best would have the court disapprove the rule in *Midland* or, at least, decline to apply it here, despite the Board's explicit retroactivity decision. This court has applied *Midland* in one *per curiam* decision. *See N.L.R.B. v. Yellow Transportation Company,* 709 F.2d 1342, 1343 (9th Cir. 1983). The court implicitly approved both the *Midland* doctrine and its retroactivity. Other circuits have been explicit in their approbation,[8] albeit some with reservations.[9]

---

**8.** *See, e.g., N.L.R.B. v. Chicago Marine Containers, Inc.,* 745 F.2d 493, 498–500 (7th Cir.1984) (accepting *Midland,* analyzing and applying it under retroactivity standard); *Hickman Harbor Service v. N.L.R.B.,* 739 F.2d 214, 218 (6th Cir. 1984) (no abuse of discretion in retroactive application of *Midland* ); *N.L.R.B. v. Mich. Rubber Products, Inc.,* 738 F.2d 111, 116 (6th Cir.1984) (proper test to apply is that currently applied by Board); *N.L.R.B. v. Semco Printing Center, Inc.,* 721 F.2d at 892 (Board had reasonable basis in law for returning to *Shopping Kart* to which court defers; also defer to retroactive application absent manifest injustice); *N.L.R.B. v. Monark Boat Co.,* 713 F.2d 355, 360–361 (8th Cir. 1983) (apply *Midland* as current law unless manifest injustice results); *NLRB v. Rolligon Corp.,* 702 F.2d 589, 595 (5th Cir.1983) (applying *Riveredge Hospital* gloss on *Midland* ).

**9.** The reservations have been expressed in cases from the First, Sixth, and Eleventh Circuits. In *Certainteed Corp. v. N.L.R.B.,* 714 F.2d 1042, 1052–1060 (11th Cir.1983), the court approved both *Midland* and its general retroactive application, but balked at resolving whether to apply the doctrine retroactively to the case before it, which had been decided by the Board under the *Hollywood Ceramics/General Knit* standard. In

contrast, the present case was decided by the Board under the *Midland* standard.

In *N.L.R.B. v. New Columbus Nursing Home, Inc.,* 720 F.2d 726, 730 (1st Cir.1983), the majority adopted *Midland* retroactively, but Senior Circuit Judge Bailey Aldrich, concurring, characterized *Midland's* rule as "burning down the barn to get rid of the rats; an abnegation of the Board's recognized duty to ensure a fair and free choice of bargaining." He nevertheless agreed that the rule should be applied.

In *Van Dorn Plastic Machinery Co. v. N.L.R.B.,* 736 F.2d 343, 348 (6th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985) the court stated that cases "where the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their rights to a free and fair choice will be affected" should be excepted from the rule in *Midland.* Best has not argued for such an exception here; the "misrepresentations" complained of were analyzed by the Hearing Officer in his Report and Recommendations on Objections of July 26, 1982, under the *Hollywood Ceramics* standard. He concluded that the wage comparison representation was "not of such magnitude or such a substantial departure from the truth so as to

There is ample justification for the Board's *Midland* rule. The Board may alter its standards provided that its new rules are both rational and consistent with the Act. *Hotel Employees, etc. v. NLRB & Rossmore House Hotel,* 760 F.2d 1006, 1009 (9th Cir.1985). The Board's return to a rule of generally not intervening in the electoral process to correct misrepresentations is based upon its weighing the supposed benefits of such intervention against the effects that such intervention has on the "competing policy favoring prompt completion of election proceedings." *N.L.R.B. v. Berryfast, Inc.,* 741 F.2d at 1162.

The Board has paid heed to academic specialists who have expressed doubts about the effectiveness of intervention to correct the effects of campaign tactics. *See* Bok, *The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act,* 78 Harv.L.Rev. 38, 65 (1964) (rules purporting to permit more rational decisions by voters have speculative value); Brotslaw, *Attitude of Retail Workers Toward Union Organization,* 18 Lab.L.J. 149, 170 (1967) (questioning, based on empirical study, whether employees subjected to pressures and counter-pressures during representation election fully perceive effect upon voting behavior attributable to campaigns conducted by parties); Samoff, *NLRB Elections: Uncertainty and Certainty,* 117 U.Pa.L.Rev. 228, 235 (1968) (Board has based its election controls on self-fulfilling prophecy about undue influence on employees).[10]

The study that most impressed the Board, see *Shopping Kart Food Market,* 228 NLRB at 1313, was one by Professors Getman and Goldberg, *The Behavioral Assumptions Underlying NLRB Regulation of Campaign Misrepresentations: An Empirical Evaluation,* 28 Stan.L.Rev. 263 (1976).[11] They interviewed some 1000 voters while studying 31 election campaigns in five states. The study's most significant findings were that the votes of 81 percent of employees could be predicted from their pre-election intent and their general atti-

constitute a material misrepresentation or warrant the election being set aside." (citations omitted). The Hearing Officer's investigation of the union newspaper article concerning the "plant closure" and the u.l.p. was characterized as creating "substantial and material issues of fact regarding the veracity of (its) statements as well as the time and opportunity available to the Employer for an effective reply". It cannot be persuasively argued that such conduct is the sort of all-pervasive lying that the Sixth Circuit had in mind in enunciating its exception to *Midland.*

The case at bar is also readily distinguishable from *Mosey Manufacturing Co. v. NLRB,* 701 F.2d 610, 612 (7th Cir.1983) (*en banc*), relied on by the employer here. The Seventh Circuit, in *N.L.R.B. v. Chicago Marine Containers, Inc.,* 745 F.2d at 499 has explained that "In *Mosey,* the election took place five years prior to the court's opinion and was decided by only one vote. During the pendency of that case, the Board had changed the rule on misrepresentations twice and, as a result, protracted and expensive litigation occurred (cite). We observed that these facts made the case 'so unusual … that we cannot be sure it was in the Board's contemplation when the Board announced … that the new rule would apply to all pending cases (cite).' We noted that remand to the Board would therefore be appropriate to allow the board to decide which standard to apply, but declined to do so because the lengthy, Board-caused delay convinced us that its order should not be enforced at all." The *Chicago Marine* court distinguished *Mosey* from the case that it had before it on the ground that no "unusual circumstances" were present, i.e., there was not a narrow election majority, the Board had changed the rule on misrepresentations only once since the election and delay was a function of administrative and judicial review. Similarly, none of the "unusual circumstances" present in *Mosey* are pertinent to the instant matter.

**10.** The Bok article is cited in both *Shopping Kart,* 228 NLRB at 1312 and *Midland,* 263 NLRB at 131; the Brotslaw and Samoff articles are cited in *Shopping Kart,* 228 NLRB at 1313 n. 22 and 17, respectively. *Midland* is, of course, little more than a reaffirmation of *Shopping Kart. See Midland* at 132–133 ("(W)e again express our emphatic belief that on balance the rule in *Shopping Kart* best accomodates and serves the interests of all").

**11.** This article was proceeded by one authored by Getman, Goldberg and Herman, *NLRB Regulation of Campaign Tactics: The Behavioral Assumptions on Which the Board Regulates,* 27 Stan.L.Rev. 1465 (1975). The complete study appeared in monograph in Getman, Goldberg and Herman, *Union Representation Elections: Law and Reality* (1976).

tude toward working conditions and unions and that employees generally paid very little attention to the content of the election campaign. Getman and Goldberg, 28 Stanford L.Rev. at 276–279. Those who switched from being pro-union or undecided to being anti-union were rarely influenced by the company's propaganda; those who switched from being anti-union or undecided to being pro-union were somewhat more often influenced by the content of the union campaign, but the latter category was insufficiently numerous to determine the outcome of many elections. *Id.* at 276–282. The authors concluded that because misrepresentations so infrequently determined the outcome of elections, the *Hollywood Ceramics* doctrine was basically a retardant of employee "free choice." *Id.* at 283.

The *Shopping Kart/Midland* doctrine is based upon the Board's own considerable experience and on empirical studies.[12] It is therefore not irrational. Since free choice has always been the principal aim of those portions of the Act that provide for representation elections, see *General Shoe Corp.*, 77 NLRB 124, 127 (1948), it cannot be concluded that the Board's re-adopting of a policy of non-intervention contradicts the Act. There was a "reasonable basis in law" for the Board's change of policy. We defer to the Board's decision to affect that change. *See NLRB v. Hendricks County Rural Electric Corp.*, 454 U.S. 170, 176, 102 S.Ct. 216, 221, 70 L.Ed.2d 323 (1981).

### C. Retroactivity of *Midland* Rule

In *NLRB v. Food Store Employees Union Local 347*, 417 U.S. 1, 10 n. 10, 94 S.Ct. 2074, 2080 n. 10, 40 L.Ed.2d 612 (1974), the Supreme Court stated the approach of federal courts to the question of whether to apply an administrative agency's change of policy retroactively:

Appellate courts ordinarily apply the law in effect at the time of the appellate decision ... However, a court reviewing an agency decision following an intervening change of policy by the agency should remand to permit the agency to decide in the first instance whether giving the change retrospective effect will best effectuate the policies underlying the agency's governing act (cite).

■ The agency here has already emphatically proclaimed its desire for *Midland's* retroactive application and, while the court is not bound by the Board's views on retroactive application, it should defer to those views absent manifest injustice. *Bradley v. School Board of Richmond*, 416 U.S. 696, 716, 94 S.Ct. 2006, 2018, 40 L.Ed.2d 476 (1974). Given that there had only been a report and recommendations to hold a hearing and no Board decision in this case before *Midland* was handed down, it is problematical whether "retroactivity" is even needed here. If it is, no manifest injustice would flow from the decision to abide by the Board's policy here. Applying *Midland*, none of Best's misrepresentation claims may be considered by the Board, since none involved the use of forged documents. The Board did not err in rejecting those claims.

### V. THE UNION'S MAJORITY STATUS

■ Best claims that the Board's order should not be enforced because employee turnover has resulted in the union losing its support of the majority of employees at the showroom and warehouse. This argument is untenable. Once a union has been certified it enjoys a presumption of continued majority status that is irrebutable for a reasonable time, usually one year, and is

---

**12.** These studies that have not gone uncriticized, see, e.g., Miller, *The Getman, Goldberg and Herman Questions*, 28 Stan.L.Rev. 1163, 1170 (1976) (elections studied by Getman, *et al.*, all held under *Hollywood Ceramics* regime, where material misrepresentation prohibited); Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA*, 96 Harv.L. Rev. 1769, 1781–1786 (1983) (Getman, *et al.*

wrongly appraised evidence of impact of coercive campaigning by employers). A reply to the early criticism was made in Goldberg, Getman & Brett, *Union Representation Elections: Law and Reality: The Authors Respond to the Critics*, 79 Mich.L.Rev. 564, 589 (1981) (setting aside Board election not deterrent to conduct that *Hollywood Ceramics* sought to control).

rebuttable thereafter by an employer showing that the union was in the minority or that the employer had a a good faith reasonable doubt of union support. *Financial Inst. Employees of America v. N.L. R.B.*, 752 F.2d 356, 365 (9th Cir.1984). The Board's view that the one year period of irrebutability should run from the date of certification rather than the date of election has been approved by the Supreme Court. *See Brooks v. National Labor Relations Board*, 348 U.S. 96, 104, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954).

The certification year has not yet begun to run here, since the Board ordered that the period of certification would begin on the date that Best commences good faith bargaining, as it may do under *Mar-Jac Poultry Co.*, 136 NLRB 785 (1962), a decision that has been approved by this court on more than one occasion. *See N.L. R.B. v. Lee Office Equipment*, 572 F.2d 704, 707 n. 5 (9th Cir.1978); *N.L.R.B. v. C. & C. Plywood Corporation*, 413 F.2d 112, 115 (9th Cir.1969). It is thus immaterial whether there has been great employee turnover or a significant lapse of time since the election. *See also NLRB v. International Union, Progressive Mine Workers of America*, 375 U.S. 396, 84 S.Ct. 453, 11 L.Ed.2d 412 (1964) (*per curiam* ), *reversing International Union, Progressive Mine Wkrs. v. N.L.R.B.*, 319 F.2d 428 (7th Cir. 1963) (ordering Board to determine employee choice of representative at time of enforcement proceeding because of significant turnover and great lapse of time). The beginning of the irrebutable presumption of a union majority may properly run from the date of the Board's decision in the u.l.p. case until one year after Best complies with the Board bargaining order's command to negotiate in good faith.

## VI. CONCLUSION

There is substantial evidence for the Board's conclusion that Best violated the Act by refusing to bargain with Local 428. The Board correctly concluded that the election was untainted by the imbalance of observers, that it could retroactively apply

*Midland* to dispose of Best's misrepresentation challenges and that the union is irrebutably presumed to have a majority. The Board order is ENFORCED.