**US ECOLOGY, INC., Petitioner**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner**

**v.**

**US ECOLOGY, INC., Respondent.**

**Nos. 85–7154, 85–7259.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 5, 1985.

Decided Oct. 3, 1985.

J. Markham Marshall, Preston, Thorgrimson, Ellis & Holman, Seattle, Wash., for petitioner.

Elinor Hadley Stillman, NLRB, Washington, D.C., for respondent.

Before WRIGHT, PREGERSON, and ALARCON, Circuit Judges.

OPINION

ALARCON, Circuit Judge:

US Ecology, Inc. (hereinafter US Ecology)[1] seeks review of the National Labor

---

1. Throughout its briefs, petitioner refers to itself as US Ecology, Inc., while the Board refers to it as US Ecology, Inc. Because petitioner's initial petition for review with this court reflects the latter spelling, we refer throughout this opinion to petitioner as US Ecology, Inc.

Relations Board's (hereinafter NLRB or the Board) order, 274 NLRB No. 58 (1985), requiring that US Ecology bargain with the union certified by the Board. US Ecology appeals on three grounds: (1) material pre-election misrepresentations allegedly made by the union which may have prevented employees from casting voluntary votes; (2) the appearance of partiality potentially created by the Board agent's delegation to an observer of certain tasks relating to the conduct of the election; and (3) the potential for electioneering inherent in the Board agent's delegation to an observer of tasks involving conversation with the voters. The Board cross-petitions for enforcement of its order.

## I

### FACTUAL BACKGROUND

US Ecology is engaged in the business of chemical and radioactive waste disposal. On July 22, 1983, the Oil, Chemical, and Atomic Workers International Union, Local 1–369 AFL–CIO (the Union) filed a representation petition with the Board by which it sought certification as the bargaining representative of US Ecology's operators and radiation technicians and its maintenance, shipping and receiving, and laboratory employees. A "Stipulation for Certification Upon Consent Election" was executed by all parties on August 12, 1983.

The Board conducted an election on August 26, 1983. After the voting was completed, the tally of ballots showed nine votes for the Union and seven votes against it. US Ecology filed timely objections to the election, alleging that the election should be set aside because (1) the Union made material pre-election misrepresentations which prevented the employees from making a free choice in casting their vote, and (2) the Board agent's delegation of certain tasks to the Union observer during the election contributed to an appearance of partiality to the Union, and allowed electioneering during the election. Following an administrative investigation, a hearing was held on US Ecology's objections. The hearing officer issued a report overruling US Ecology's objections to the election.

US Ecology filed exceptions to the report, but the Board adopted the hearing officer's findings and recommendations and directed that the Union be certified.

The Union requested that US Ecology bargain. US Ecology refused. The Union filed an unfair labor practice charge with the Board. The Regional Director issued a complaint alleging that US Ecology had refused to bargain with the Union in violation of the National Labor Relations Act (NLRA) §§ 8(a)(1) and (5), 29 U.S.C. §§ 158(a)(1) and (5). The Board granted General Counsel's motion for summary judgment on February 28, 1985.

## II

### STANDARD OF REVIEW

██ An order of the NLRB is to be enforced if the Board correctly applied the law and if the Board's factual findings are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951); *NLRB v. Best Products Co.*, 765 F.2d 903, 906 (9th Cir.1985).

## III

### ALLEGED CAMPAIGN MISREPRESENTATIONS

US Ecology first contends that the Union made material pre-election misrepresentations which prevented the employees from making a free choice in casting their vote. US Ecology claims that two material pre-election misrepresentations were made by the Union: (1) on August 25, the day before the election, the Union's international representative distributed material to the employees' homes which contrasted pay scales at US Ecology with pay scales at unionized companies; and (2) on the eve of the election, a US Ecology employee told those employees in attendance at a Union dinner held in a local restaurant that a company vice-president had made threats concerning the employee's job which supposedly would be carried out if the Union won the election.

The Board's current rule governing the treatment of alleged campaign misrepresentations is set forth in *Midland National Life Insurance Co.,* 263 NLRB 127 (1982). In *Midland,* the Board stated:

[W]e will no longer probe into the truth or falsity of the parties' campaign statements ... [nor] set elections aside on the basis of misleading campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is.

*Id.* at 133. Although the Board has vacillated in its willingness to review misrepresentations made during a union's representation campaign and the *Midland* rule represents a departure from previous Board policy, the *Midland* rule was applicable at the time of the election in the instant case.

The Board's altered interpretation of the NLRA is entitled to deference and should be upheld if rational and consistent with the Act. *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979); *NLRB v. Best Products Co.,* 765 F.2d at 912. US Ecology contends that the Board's decision in *Midland* is incorrect because it violates the NLRA and is inconsistent with the Board's duty to insure free choice by employees. US Ecology also argues that the *Midland* rule is arbitrary and conflicts with previous Board decisions. We disagree.

■ We have recently had occasion to address these arguments in *NLRB v. Best Products Co.* In *Best,* the employer urged us to disapprove the rule in *Midland* and set aside an election based upon material misrepresentations made by the union during the campaign. We declined the employer's invitation to disapprove the *Midland* rule because the Board demonstrated ample justification for the rule and the rule is consistent with the NLRA. *Best Products,* 765 F.2d at 911–12. Although we recognized that *Midland* was the fourth change in twenty years of the Board's policy in dealing with misrepresentations made during election campaigns, we found that the rule furthered the purposes of the NLRA. We stated: "The Board's return to

a rule of generally not intervening in the electoral process to correct misrepresentations is based upon its weighing the supposed benefits of such intervention against the effects that such intervention has on the 'competing policy favoring prompt completion of election proceedings.' " *Best Products,* 765 F.2d at 912 (*quoting NLRB v. Berryfast, Inc.,* 741 F.2d 1161, 1162 (9th Cir.1984)). Because the *Midland* rule was based upon the Board's own considerable experience and empirical studies, we concluded that the *Midland* rule is not irrational. *Best Products,* 765 F.2d at 913. Since free choice is the principal aim of the portions of the NLRA which relate to representation elections, the Board's re-adoption of a policy of non-intervention does not contradict the Act. *Id.*

■ US Ecology also argues that the application of *Midland* in the instant case violates the "twenty-four hour rule" previously established by the Board in *Peerless Plywood Co.,* 107 NLRB 427 (1953). In *Peerless,* the Board adopted a rule prohibiting either party to an election "from making speeches on company time to massed assemblies of employees within 24 hours before the scheduled time for conducting an election." *Id.* at 429.

*Best* does not resolve the question whether the *Peerless* "twenty-four hour rule" survives the Board policy of nonintervention adopted in *Midland.* We need not decide the question, however, because the instant case does not fall within the *Peerless* rule. *Peerless* concerned only one form of electioneering: "captive audience speeches" made on company time within the twenty-four hour period preceding an election. *NLRB v. Hudson Oxygen Therapy Sales Co.,* 764 F.2d 729, 732 (9th Cir. 1985). As the Board made clear in *Livingston Shirt Corp.,* 107 NLRB 400 (1953), other lawful means of persuasion—including inviting employees to listen to speeches on or off the employer's premises, writing letters to employees and issuing statements to them—are permitted within the twenty-four hour period so long as they are

conducted on the employees' own time and attendance is voluntary. *Id.* at 408.

In the instant case, the alleged misrepresentations were not made on company time, did not take place on company premises, and attendance at the Union dinner on the eve of the election was voluntary. Therefore, we need not consider the question whether *Peerless* survives the change of Board policy embodied in *Midland*.

■ Finally, US Ecology argues that the Board's tendency to establish rules governing conduct during election campaigns through adjudication rather than through rulemaking, in combination with its vacillation on the policy question of the propriety of intervention, renders it difficult for parties to an election to determine exactly what rules will be held to govern their conduct. This argument is meritless. This court has noted that "[t]he authority of the Board to establish election rules in adjudicatory proceedings is now unquestioned." *NLRB v. Hudson Oxygen Therapy Sales Co.*, 764 F.2d at 733. Moreover, US Ecology had ample notice that the *Midland* rule would be applicable to this election. *Midland* was decided in August of 1982, and the US Ecology election was held in August of 1983.[2]

US Ecology does not contend that the misrepresentations involved forged documents justifying Board intervention under *Midland*. Because the *Midland* rule is based upon valid, rational considerations and does not violate the NLRA, US Ecology's petition for review of the Board's decision on its objections to alleged campaign misrepresentations is denied.

## IV

### CONDUCT OF ELECTION

■ US Ecology also argues that the election should be set aside because the Board agent failed to follow procedures required to ensure a fair election. The Board has broad discretion to establish the procedures and safeguards necessary in conducting representation elections. *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330–31, 67 S.Ct. 324, 327–28, 91 L.Ed. 322 (1946); *Best Products*, 765 F.2d at 908.[3]

### A. APPEARANCE OF NEUTRALITY

■ US Ecology first argues that the Board agent compromised the Board's appearance of neutrality during the election proceedings by soliciting assistance from a Union observer in conducting the election. Prior to the election, the Board agent held a pre-election conference where she announced that she would have either the Union observer or the company observer read the poll opening announcement. The attorney representing US Ecology objected to either observer reading the announcement. Despite this objection, the parties decided to flip a coin to determine who would read the announcement. The Union observer won, and he read the announcement to the voters while the company observer stood by.

The two observers then entered the voting area and the Union observer took a seat nearest the door. The Board agent asked the Union observer to signal the first voter to come in. The Union observer did so, and asked each subsequent voter to state his name as he entered the voting area.

The Board must maintain and protect the integrity and neutrality of its procedures in conducting elections. *Alco Iron & Metal Co.*, 269 NLRB 590, 591 (1984). However, Board agents are permitted to request assistance from the observers present at the election. 29 C.F.R. § 101.19(a)(2). Section 101.19(a)(2) provides: "The actual polling is always conducted and supervised by Board agents. Appropriate representatives of

---

**2.** Furthermore, we approved the retroactive application of the *Midland* rule in *Best Products*. *Best Products*, 765 F.2d at 913.

**3.** US Ecology asserts that the rules governing election conduct should be construed more strictly in cases where the election was decided by a single vote. However, "[t]he closeness of the vote is simply one factor the board and courts consider in scrutinizing pre-election conduct. It is not the controlling factor." *NLRB v. Eskimo Radiator Mfg. Co.*, 688 F.2d 1315, 1319 (9th Cir.1982).

each party may assist [the Board agents] and observe the election." In requesting assistance, the Board agent must take care not to turn over control of the election to an observer. *Alco Iron & Metal Co.*, 269 NLRB at 591–92 & n. 2. Board elections must be conducted in a manner which inspires confidence in the impartiality of the Board and its agents. *Id.* at 591 n. 2.

In the instant case, the Board agent delegated only minor tasks and did so in a manner which did not compromise the Board's appearance of neutrality. Two other circuits have rejected the argument that impartial delegation to an observer of such innocuous tasks destroys the Board's appearance of neutrality. In *NLRB v. Michigan Rubber Products, Inc.*, 738 F.2d 111 (6th Cir.1984), the Sixth Circuit held that a Board agent's request that one of the observers station himself at the door and admit employees into the voting area one at a time did not give the impression of a pro-union bias, or appear to afford the union control over the voting process. *Id.* at 114. The court opined that the method by which the union observer was chosen was properly neutral; the union observer performed the task because he was standing closest to the door at the time. *Id.*

In *NLRB v. ARA Services, Inc.*, 717 F.2d 57 (3d Cir.1983) (en banc), the Third Circuit enforced the Board's bargaining order based upon an election in which the Board agent permitted a union observer to ask each employee to give his name as he came in to vote. *Id.* at 61, 69. The court noted that it is proper and even necessary for observers not personally acquainted with every member of the bargaining unit to require identification for challenge purposes. *Id.* at 68. The employer's argument that delegation of this task caused employees to believe that the union observer acted "too officiously" did not present a substantial and material factual issue as to the fairness of the election. *Id.* at 69.

In the instant case, the Board agent's request for assistance in ushering employees into the room constituted delegation of a minor task based on objective considerations (the Union observer was closest to the door), and therefore did not impair her appearance of neutrality. Similarly, the Union observer's request that each voter state his name as he entered the voting area was proper and did not represent an abrogation of the Board agent's control over the election. *NLRB v. ARA Services, Inc.*, 717 F.2d at 68. Finally, the Board agent's choice of the Union observer to read the poll opening announcement was made after a neutral coin toss, the company observer stood by the Union observer's side as he read the announcement, and the content of the announcement had been agreed on by all the parties. This neutral method of delegating a minor task also did not impair the Board's appearance of neutrality.

Our statement in *Best Products* that election observers have "uncomplicated tasks," including that of identifying voters, is not to the contrary. In *Best* we noted that an observer's "principal" task was that of identifying voters. *Best*, 765 F.2d at 907. It is not, however, the *only* uncomplicated task which an observer may perform. We did not purport to address in *Best* the question of what tasks a Board agent may delegate to an observer without losing control over the election. Because the Board agent delegated only minor, uncomplicated tasks to the Union observer in the instant case, she did not lose control over the conduct of the election.[4]

US Ecology's reliance on *Summa Corp. v. NLRB*, 625 F.2d 293 (9th Cir.1980) is misplaced. In *Summa*, this court refused to enforce a Board decision overruling an employer's objections to an election in which the Board agent allowed three union observers to be present at the election, in violation of an election stipulation between the parties providing for two observers for

---

**4.** US Ecology also asserts that the Union observer's status as an unofficial shop steward contributed to an appearance of pro-Union bias by the Board because the observer was so closely identified with the Union. We disagree. The fact that the Board agent delegated only innocuous tasks and did so by neutral means persuades us that the Board's appearance of impartiality was not impaired.

each side. The court found that a stipulation providing for an equal number of observers is material to the election process and that there was a significant risk that a Board agent's acquiescence to an imbalance in the number of observers could create an impression of predominance on the part of the union and partiality on the part of the Board. *Id.* at 295. Here, the assistance of the Union observer in performing minor tasks was not material to the election process, and there was nothing in the Board agent's or the Union observer's conduct which could create an impression of predominance on the part of the Union.

US Ecology next argues that the delegation of duties that could have been performed by the Board agent is not "assisting" within the meaning of 29 C.F.R. § 101.19(a)(2). This argument is unsupported by case authority. US Ecology also argues that the Board's decision in this case was inconsistent with recent Board decisions. The cases cited by US Ecology are readily distinguishable from the instant case.

In *Alco Iron & Metal Co.*, 269 NLRB 590 (1984) the Board set aside an election where the Board agent allowed the union observer to interpret and explain the voting procedures to Spanish-speaking employees. The Board found that because the Board agent provided no additional instruction or guidance and did not participate further in the conduct of the election, the atmosphere of impartiality in which the election should have been held was not present because the delegation of an important part of the election process to the union observer conveyed the impression that the union was responsible for running the election. *Id.* at 591–92. Here, however, the Board agent delegated only minor tasks to the Union observer and did not turn over control of the election to the Union observer.

*Harry Lunstead Designs, Inc.*, 270 NLRB No. 174, 116 LRRM 1289 (1984) is completely inapplicable to the present case. It involved a Board agent's erroneous confiscation of a voter eligibility list which the employer's observer intended to use to challenge the voters, and his instruction

that there could be only one list in the room. 116 LRRM at 1294. The Board held that the fact that the employer subsequently allowed a voter to cast an unchallenged ballot was a direct result of the Board agent's erroneous instructions, and concluded that the Board agent's errors interfered with the conduct of the election. *Id.* at 1295. There was no discussion of the impact of the agent's errors on the Board's appearance of neutrality.

■ Thus, the Board agent's conduct in allowing the Union observer to assist her during the election properly falls within the parameters of "assistance" permitted by 29 C.F.R. § 101.19(a)(2) and did not compromise the Board's appearance of impartiality.

### B. ELECTIONEERING

■ US Ecology next contends that the Union observer's communications with the employee-voters constituted electioneering in violation of section 1136.2 of the Board's *Casehandling Manual* (prohibiting observers from engaging in conversation with incoming voters or otherwise engaging in electioneering). US Ecology argues that the Board has established a blanket rule prohibiting conversations between observers and voters which is not limited to those conversations whose content can be characterized as electioneering, relying upon *Milchem, Inc.*, 170 NLRB 362 (1968).

In *Milchem,* the Board set aside an election where a union observer was permitted to stand for several minutes near the line of employees waiting to vote, engaging them in conversation regarding the weather and similar topics. The Board held that *"sustained conversation* with prospective voters waiting to cast their ballots, regardless of the content of the remarks exchanged, constitutes conduct which, in itself, necessitates a second election." *Id.* at 362 (emphasis added). The Board reasoned:

[T]he potential for distraction, last minute electioneering or pressure, and unfair advantage from prolonged conversations between representatives of any par-

ty to the election and voters waiting to cast ballots is of sufficient concern to warrant a strict rule against such conduct, without inquiry into the nature of the conversations.... The difficulties of recapturing with any precision the nature of the remarks made in the charged atmosphere of a polling place are self-evident, and to require an examination into the substance and effect of the conversations seems unduly burdensome and, in this situation, unnecessary. Finally, a blanket prohibition against such conversations is easily understood and simply applied.

*Id.* The Board noted, however, that its application of the rule would be "informed by a sense of realism," and that "chance, isolated, innocuous comment or inquiry by an employer or union official to a voter" will not necessarily void an election. *Id.* at 363.

The strict rule established in *Milchem* is not applicable to the instant case because there were no "conversations," prolonged or otherwise, between the Union observer and the voting employees. Instead, at the Board agent's request the observer simply assisted her in conducting the election by beckoning voters into the polling place, requesting that each employee state his name as he entered, and reading an agreed-upon statement to them. None of these activities constituted "conversations" covered by the *Milchem* rule because they did not involve an exchange of words and because they were conducted at the agent's request and related solely to the conduct of the election. *See South Pacific Furniture, Inc. v. NLRB*, 627 F.2d 173, 175 (9th Cir. 1980) (a union observer's essentially neutral invitation to "[c]ome on and vote, exercise your power" could not be characterized as a "conversation," much less a "sustained" one); *cf. Modern Hard Chrome Service Co.*, 187 NLRB 82 (1970) (election set aside where, despite being admonished not to converse with voters, union observer spoke at length with employees as they approached the voting table, offering one of the voters a loan to buy a beer).

US Ecology also argues that the Board's decision on the company's electioneering objection was inconsistent with the Board's recent decision in *Bio-Medical Applications of Puerto Rico, Inc.*, 269 NLRB 827 (1984). In *Bio-Medical*, the Board set aside an election because a union representative who was not an authorized observer remained in the waiting room adjacent to the polling area despite the Board agent's admonitions, and spoke with four voters as they approached the polls. *Id.* at 829. The Board found that the *Milchem* rule applied, and that the conversations held in the waiting room did not fall within the "chance, isolated, innocuous comment or inquiry" exemption from *Milchem's* blanket prohibition. *Id.* The Board pointed out that although the conversations were not "prolonged," the unauthorized observer's presence in the waiting room continued throughout the election in contravention of the agent's explicit admonition. *Id.* at 830. In contrast, in the present case the Union observer's presence in the voting area *was* authorized, and no conversations were held.

In short, the Board agent's request that an observer assist her with minor tasks relating to the conduct of the election did not compromise the Board's appearance of neutrality, nor did the carrying out of her instructions involve the observer in electioneering or conversations prohibited by the *Milchem* rule. We deny US Ecology's petition for review of the Board's decision to deny US Ecology's election objections based upon the conduct of the election.

## V

### CONCLUSION

The Board correctly applied the *Midland* rule to dispose of US Ecology's misrepresentation challenges, and correctly concluded that the election was untainted by the Board agent's delegation of minor tasks to the Union observer. Therefore, US Ecology's petition for review is denied. The Board's order is ENFORCED.